NOT DESIGNATED FOR PUBLICATION

No. 121,767

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DANIEL L. MYERS, M.D.,
*Appellant*,

v.

KANSAS STATE BOARD OF HEALING ARTS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed November 20, 2020. Affirmed.

*Mark W. Stafford*, of Forbes Law Group, of Overland Park, for appellant.

*Tucker L. Poling*, general counsel, and *Courtney E. Cyzman*, assistant general counsel, for appellee.

Before GREEN, P.J., ATCHESON and GARDNER, JJ.

PER CURIAM: Daniel L. Myers, M.D., appeals from the Shawnee County District Court's order affirming the decision of the Kansas State Board of Healing Arts (Board) to deny his application for medical license reinstatement. On appeal, Myers argues that the district court erred by affirming the Board for three reasons: (1) because the Board's credibility determinations against his witnesses were unsupported and unreasonable; (2) because the Board's finding that he attempted to shift his burden of proof was unsupported; and (3) because the Board's findings against his medical license

1

reinstatement under the factors created by our Supreme Court in *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 808 P.2d 1355 (1991), were unsupported and unreasonable.

Myers' appeal also involves a jurisdictional issue of first impression. Upon docketing his appeal, this court ordered Myers to show cause why this court had jurisdiction over his appeal. It is undisputed that Myers filed the notice of appeal that the Shawnee County District Court Clerk approved outside of K.S.A. 60-2103(a)'s 30-day time limit to appeal. Nevertheless, Myers argues that this court has jurisdiction over his appeal because the district court clerk wrongly rejected a notice of appeal that he filed within K.S.A. 60-2103(a)'s time limits.

We agree. And we, therefore, conclude that this court has jurisdiction to consider the merits of Myers' underlying arguments about the Board's denial of his medical license reinstatement application. Yet, because Myers' underlying arguments about the Board wrongly denying his application for medical license reinstatement are unpersuasive, we affirm the denial of Myers' medical license reinstatement application.

*Myers' Historical Behavioral Problems*

Myers received his license to practice medicine and surgery in 1988. From August 1999 through October 2008, he practiced medicine in Parsons, Kansas, at the Labette County Medical Center (LCMC).

From 2005 to mid-2006, Myers had multiple negative encounters with nurses at the hospital. This included grabbing a nurse's face and shoulder without permission, telling a nurse that he should not have to "write out idiot orders," and returning a patient's dirty diaper to the nurses' station.

2

As Myers struggled at work, he also struggled within his personal life. Myers was married. Nevertheless, in late 2005, Myers started an affair with P.S., a nurse at LCMC. Between 2005 and 2006, Myers attempted to maintain his marriage while also having an extramarital relationship with P.S.

Based on Myers' struggles, LCMC referred Myers to the Kansas Medical Society's (KMS) Medical Advocacy Program (MAP). MAP helped physicians experiencing problems affecting their ability to practice medicine. Judith Janes, the director of KMS at that time, referred Myers to Rush University Medical Center (Rush) for a multidisciplinary psychiatric evaluation.

There, in July 2006, Myers completed a multidisciplinary psychiatric evaluation. Based on Myers' evaluation, the Rush evaluators diagnosed Myers with depressive disorder—not otherwise specified, personality disorder—not otherwise specified with passive aggressive tendencies, and obsessive-compulsive personality disorder. They also opined that Myers did not "take responsibility for his inappropriate behavior, externalize[d] blame, and [had] an unrealistic sense that others should unquestionably accept and adopt his position." Finally, the Rush evaluators recommended (1) that Myers regularly meet with a physician mentor, (2) that Myers complete at least six months of therapy, and (3) that Myers seek help from MAP for his disruptive behavior.

Following the Rush assessment, Myers went to therapy for about six months. It does not seem that Myers obtained a physician mentor or sought additional help from MAP. Moreover, during this period, Myers divorced his wife. After his divorce, Myers' relationship with P.S. continued until he moved to Iola, Kansas, in January 2009. There, Myers began practicing general surgery at the Allen County Hospital (ACH).

3

Within weeks of starting his new job at ACH, Myers began dating J.R. J.R. was a nurse who worked at ACH. According to Myers, their relationship ended abruptly in September 2009.

Despite J.R. ending their relationship, Myers continued to pursue J.R. During the months that followed the end of their relationship, Myers started stalking J.R. Specifically, he frequently walked past J.R.'s apartment, he followed J.R. to stores, and he spied on J.R. On one occasion, Myers attempted to break into J.R.'s apartment while using a ladder that he had taken from the hospital. Furthermore, in addition to unwanted physical contact, Myers frequently texted J.R.

Ultimately, ACH learned about Myers' stalking, ordering Myers to stop all communication with J.R. unrelated to patient care. It further ordered Myers to seek therapy from a licensed counselor. It was at this juncture Myers started counseling with Dr. Carolyn Westgate. While in therapy with Westgate, however, Myers continued stalking J.R. Most significantly, the police cited Myers for misdemeanor stalking on March 24, 2010, and on April 11, 2010. Myers' misdemeanor stalking citations resulted in criminal charges.

Although Myers' stalking charges were eventually diverted, because of his stalking charges, several things occurred in late April 2010. First, ACH terminated his employment contract. Second, Myers voluntarily moved his medical license from active status to inactive status. Third, Myers contacted KMS for help. KMS referred Myers to the Professional Enhancement Program (PEP) at the Pine Grove Recovery Center to undergo another multidisciplinary psychiatric evaluation.

Between late April 2010 through June 2010, Myers attended therapy at PEP. The PEP evaluators diagnosed Myers with both "relational issues" and "occupational issues." They opined that Myers was "narcissistic" with "dependent obsessive compulsive traits."

4

They explained that Myers was suffering from "severe psychosocial issues" because of familial problems, financial problems, occupational problems, and legal problems.

At the conclusion of Myers' therapy at PEP, the PEP evaluators provided Myers with several recommendations to follow should he want to practice medicine in the future. Those recommendations included the following: (1) that he sign a monitoring contract with MAP; (2) that he not engage in solo practice; (3) that he not return to ACH; (4) that he not engage in social contact with patients or work subordinates; (5) that he attend a continuing medical education (CME) course on leadership; (6) that he continue individual therapy with Westgate; (7) that he attend Sex Addicts Anonymous, Sex and Love Addicts Anonymous, or a similar support meeting at least once a week; (8) that he obtain a permanent sponsor in one of the preceding support groups within a month; and (9) that he return to PEP in four months for a five-day reevaluation.

Several days after leaving therapy at PEP, Myers signed a physician monitoring contract with MAP. Under this contact, Myers agreed to provide MAP with quarterly reports from Westgate on his progress. Also, should he ever reactivate his medical license, the contract required Myers to have a chaperone present when seeing all female patients. Myers' MAP monitoring contract required him to comply with its conditions for five years. Additionally, although not part of his MAP monitoring contract, it appears Janes directed Myers to attend Alcoholics Anonymous (AA) meetings. Myers had no personal or family history of alcoholism. Even so, it seems Janes directed Myers to attend AA meetings so Myers had a place to form nonromantic relationships with women and process his feelings.

Despite signing the MAP monitoring contract, Myers continued to stalk J.R. Following a stalking incident on July 11, 2010, J.R. formally complained to the Board about Myers' stalking behavior. A couple of months later, on September 8, 2010, Myers

5

drove past J.R.'s apartment. After this incident, J.R. applied for and obtained a protection from stalking order against Myers.

This order barred Myers from harassing, telephoning, contacting, or otherwise communicating with J.R. And it remained in effect until fall 2011. Even so, Myers continued to stalk J.R.

Although Myers continued to stalk J.R., in April 2011, Myers sought to reactivate his medical license. Myers was technically complying with the terms of his MAP monitoring contract by regularly attending therapy with Westgate; nothing in his MAP monitoring contract explicitly stated he could not stalk J.R. It seems that for this reason, the Board agreed to reactivate Myers' medical license. But it reactivated his license on the condition that Myers comply with certain mandates for the next five years. Those mandates were detailed in the Board's April 20, 2011 consent order, and included the following: (1) that Myers comply with his MAP monitoring contract; (2) that Myers regularly attend therapy; (3) that Myers' therapist submit quarterly reports on his fitness to practice medicine; (4) that Myers have a Board-approved female chaperone with him whenever he treated female patients; (5) that Myers follow all court orders; (6) that Myers notify the Board if his practice location changed; and (7) that Myers notify the Board and MAP if he violated the terms of the consent order or his monitoring contract. The April 2011 consent order also explicitly stated that all "monitoring provisions and limitations" listed within the consent order were not "self-terminating."

Upon the reactivation of his medical license, Myers entered into a new contract to work at ACH. He also engaged in solo practice. Myers' decisions to return to ACH and engage in solo practice were contrary to the PEP evaluators' recommendations to find a job at a new hospital and not engage in solo practice. Still, it seems that Myers complied with his consent order and his MAP monitoring contract during the remainder of 2011.

6

Yet, Myers started violating his consent order and MAP monitoring contract by July 2012. In July 2012, Westgate discontinued therapy with Myers because she had accepted the position of KMS director, replacing Janes. Despite knowing that he needed to obtain a new therapist, as well as having the names of three therapists who would see him, Myers did not obtain a new therapist after Westgate ended their therapy sessions.

Moreover, in May 2012, Myers was so behind on medical paperwork that ACH suspended his privileges until he completed the paperwork. Myers was able to complete this paperwork and have his privileges reinstated. But Myers soon had another backlog of medical paperwork. Between July 2012 and the early months of 2013, ACH had to suspend Myers' privileges three times for having a paperwork backlog. Despite having his privileges suspended, Myers never notified the Board about the suspensions. Nor did Myers inform the Board that he was no longer attending regular therapy.

Next, during the first few months of 2013, a series of events occurred, which ultimately resulted in Myers surrendering his medical license. First, on January 10, 2013, Myers used an unsterilized "non-medical device" to clean a colonoscope while performing a colonoscopy. ACH considered this incident a serious violation of its infection control and safety practices. As a result, ACH immediately suspended Myers' colonoscopy privileges and notified the Board what had happened. Second, on February 18, 2013, Westgate notified the Board that Myers had not told the Board about his prior suspensions and had violated his consent order by not regularly attending therapy. Third, on February 28, 2013, ACH terminated Myers' employment contract once again. ACH cited Myers' prior violations as well as his failure to complete certain paperwork necessary for him to practice medicine as the reason for his termination. Fourth, on March 1, 2013, the Board's disciplinary panel moved for an emergency suspension of Myers' medical license for violating his consent order and MAP monitoring contract. In addition to the problems addressed in the preceding paragraphs, the disciplinary panel alleged that Myers had treated female patients without a Board-approved female

7

chaperone. Fifth, on March 4, 2013, the Board's presiding officer entered an ex parte emergency order suspending Myers' medical license.

Myers contested the emergency suspension of his medical license. And on March 14, 2013, the presiding officer held a hearing on the matter. During that hearing, Myers testified that he had always had a female chaperone with him when treating female patients. He further testified that he had turned in his logs establishing that female chaperones were with him while treating female patients. In the end, the presiding officer vacated the emergency suspension of Myers' medical license because insufficient evidence supported that Myers posed an immediate danger to his patients. In doing so, the presiding officer stressed that he was vacating the order because "the evidence clearly demonstrate[d] that [Myers] had . . . chaperones present and ha[d] submitted documentary evidence to the Board indicating their presence." It believed Myers' failure to have "Board approved" female chaperones constituted only a technical violation of his consent order and MAP monitoring contract.

Although the presiding officer vacated the emergency order suspending Myers' medical license, the Board's disciplinary panel asked Myers to complete another multidisciplinary psychiatric evaluation. Myers complied with this request, completing another multidisciplinary psychiatric evaluation between March 22 and March 26, 2013, at the Professional Renewal Center (PRC). The PRC evaluators determined that Myers suffered from an "occupational problem," "generalized anxiety disorder," and obsessive compulsive and narcissistic tendencies. The PRC testing further established that Myers had poor cognitive awareness of appropriate boundaries, especially when dealing with patients. Based on this evaluation and Myers' history, the evaluators recommended that Myers participate in PRC's intensive therapeutic program. Myers agreed to this recommendation.

8

Accordingly, Myers attended PRC's intensive therapeutic program between April 1, 2013, and June 7, 2013. This program was designed to educate Myers on appropriate boundaries and professionalism, as well as teach Myers how to deal with his emotions. During the program, however, Myers revealed other questionable behavior, some of which constituted violations of his consent order and his MAP monitoring contract.

Specifically, Myers reported questionable treatment practices, which included treating patients in public parking lots and giving male patients hernia checks without gloves. He admitted that he would sometimes undress his male patients while giving them exams. He admitted that during his relationship with P.S., he had prescribed her weight loss medication. Moreover, he admitted that he had previously performed breast and pelvic exams on two coworkers. He told the PRC therapists that his coworkers were sexually attractive, but he did not have a sexual relationship with them. He also told his PRC therapists (1) that there was no chaperone present when he gave the exams and (2) that he had conducted breast and pelvic exams only a handful of times during the past 12 years.

Furthermore, while completing PRC's intensive therapeutic program, Myers voluntarily submitted to two polygraph tests. Before the first polygraph test, Myers admitted that he had gone on a date in January 2013 with a woman that he had performed surgery on in October 2012. This woman, L.T., was also a former coworker; she had been employed as a nurse at LCMC when Myers worked there. Myers told the PRC therapists that he and L.T. had not engaged in any type of sexual contact during their date. But the polygraph test indicated that Myers had not told the truth when he answered "no" to the following question: "Other than what you reported to me, have you ever had any other sexual relations with a patient?"

Myers later admitted that he and L.T. had engaged in oral sex during their date. Additionally, he admitted that he had contacted L.T. by phone and by text while

completing PRC's intensive therapeutic program. On top of this, Myers admitted that he continued to engage in stalking behavior and frequently checked J.R.'s Facebook page. While admitting this information, Myers told the PRC evaluators that he knew he would lose his medical license if he was caught stalking J.R.

Based on this information and Myers' multidisciplinary psychiatric evaluation, the PRC evaluators concluded that for the time being, Myers could not safely practice medicine. They described Myers as deceptive and having "significant difficulty being fully open and transparent." They believed that Myers would not be ready to practice medicine until he was "ready to engage openly in an intensive treatment process for professionals." Moreover, to better address his problems, the evaluators recommended that Myers attend regular therapy sessions and continue to participate in the MAP monitoring. They explained that it was of "critical importance" that Myers transparently communicate with Westgate and those associated with MAP. The evaluators also recommended that Myers return to PRC when he was willing to "engage openly" for an additional multidisciplinary psychiatric evaluation and additional intensive therapeutic treatment.

The PRC evaluators sent a letter to the Board summarizing the preceding information on June 10, 2013. That same day, Myers sent the Board a letter explaining that he had also seen four or five female patients in their home with only their male spouses present. Also, around this same time, Myers told Westgate that he no longer wanted to be monitored by MAP.

On June 24, 2013, Myers voluntarily entered into a new consent order in which the Board revoked his medical license. In the consent order, the Board made fact-findings about Myers engaging in the following problematic behaviors: (1) Myers refilled P.S.'s prescription; (2) Myers stalked and continued to stalk J.R.; (3) Myers engaged in a sexual relationship with former patient L.T.; (4) Myers never attended therapy after Westgate

10

terminated their patient-client relationship in July 2012; (5) Myers treated female patients without a female chaperone; (6) Myers deceived the presiding officer during the hearing on the emergency order suspending his license about treating female patients without female chaperones; and (7) Myers violated the terms of his initial consent order and MAP monitoring contract.

The Board then concluded that Myers had violated the Kansas Healing Arts Act (KHAA) to an extent requiring revocation of his license under K.S.A. 65-2836 and K.S.A. 65-2837(b). Specifically, the Board found the following:  (1) that Myers' relationship with L.T. constituted unprofessional conduct involving "sexual abuse, misconduct, or other improper sexual contact" as stated under K.S.A. 65-2836(b) and 65-2837(b)(16); (2) that by stalking J.R., Myers had willfully and repeatedly violated the KHAA contrary to K.S.A. 65-2836(f); and (3) that by not complying with the first consent order, Myers had violated a lawful rule, regulation, or order by the Board contrary to K.S.A. 65-2836(k). The Board also found that Myers engaged in unprofessional conduct likely to deceive or harm the public in violation of K.S.A. 65-2836(b) and K.S.A. 65-2837(b)(12). But the Board did not cite what specific behavior it considered likely to deceive and harm the public.

Regardless, Myers stipulated that the Board's fact-findings in the consent order were correct. He acknowledged that based on those fact-findings, the Board had sufficient evidence to find him in violation of the KHAA. Then, Myers agreed to surrender his medical license, with the Board treating his surrender as a revocation of his license. Last, Myers agreed that should he apply for medical license reinstatement, the Board would consider his application under the factors created by our Supreme Court in *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 808 P.2d 1355 (1991). Myers could not apply for reinstatement until three years had passed as stated under K.S.A. 65-2844.

11

*Myers' Activities Between June 2013 and June 2016*

About a week after he surrendered his medical license, Myers moved from Iola, Kansas, to Overland Park, Kansas. Myers continued to attend CME courses. Much of the CME documentation Myers has provided in the record on appeal is difficult to read. Nevertheless, our review of the record indicates that Myers' CME course attendance was as follows: (1) after he surrendered his license in 2013, Myers completed 51 hours of CME courses; (2) in 2014, Myers completed 73.5 hours of CME courses; (3) in 2015, Myers completed 24.75 hours of CME courses; and (4) in 2016, Myers completed 36.75 hours of CME courses. Myers later testified that he completed 49.5 hours of CME courses in 2016, but he provided no documentation to show that he had completed such courses.

Myers also volunteered following his license surrender. Starting in December 2014, Myers started volunteering once or twice weekly at the Mercy and Truth Medical Missions (Mercy) in Shawnee, Kansas. Mercy provided medical treatment to persons who were uninsured or underinsured. In essence, Myers did secretarial work at Mercy. Mercy gave Myers an outstanding volunteer service award after two years of volunteer service.

Also, after Myers surrendered his medical license, he continued to regularly attend AA meetings. Of note, although other groups had male members, Myers chose to attend an AA group that mostly women attended. Myers later stated that his "higher power had a sense of humor" because "he took a man who was a stalker, who has problems with relationships and issues in his life with women, and sent him to a [weekly] meeting" attended by him and 13 women.

Next, during this period, Myers did not immediately return to therapy. In November 2013, Myers contacted MAP and spoke to Westgate. At that time, Westgate

told Myers that MAP could continue to monitor him if he wanted to participate in the program. She also told him that a MAP therapist was willing to meet with him. Myers, however, refused Westgate's offers because he was "burnt out on therapy." At that time, Myers also told Westgate that he continued to drive past J.R.'s apartment and tracked J.R. on Facebook. Westgate had no significant contact with Myers after January 2014, when Myers called Westgate about what steps he should take to reactivate his medical license.

Myers did not resume therapy until October 2014 when Myers' attorney referred him to Dr. Kathleen Keenan, a licensed psychologist. From that point on, Myers continued to have therapy with Keenan about every two weeks.

Despite regularly attending therapy, as of April 2015, Keenan seemingly believed Myers was still struggling. Accordingly, she sought a second opinion on Myers' condition, referring Myers to Dr. William Hale, a general psychiatrist. Before Myers' session with Hale, Keenan e-mailed Hale about Myers' history. In the e-mail, Keenan seemed concerned with Myers' behavior, telling Hale that "[i]t [was] almost like there [was] a 'chip' missing in [Myers because he] just [did not] seem to get it!" During a later conversation, Keenan further told Hale that Myers "had a pattern of becoming fixated on legalisms and the unfairness of what he ha[d] considered to be illegitimate authority and a headstrong wish to rebel against such authority."

In addition to Keenan's comments, before evaluating Myers, Hale reviewed Myers' reports from the Rush, PEP, and PRC evaluators. Ultimately, Hale relied on this information and Myers' behavior during the evaluation session to conclude that Myers did not have a cognitive disorder, psychotic disorder, mood disorder, substance abuse disorder, or attention deficit disorder. Instead, his inappropriate behavior, like stalking, stemmed from "an obsessive compulsive condition," likely "obsessive personality disorder" because Myers was "ego-syntonic." Hale further explained that there was only

"slight evidence" indicating Myers had autism. Hale did not give an opinion on Myers' current fitness to practice medicine.

About a month after Hale's evaluation, Myers applied with the Board to reinstate his medical license. Myers completed his reinstatement application on December 14, 2015. Yet, because Myers filed his application for reinstatement just two years after his medical license revocation, the Board stayed Myers' application for reinstatement until three years had passed.

On December 18, 2015, just four days after completing his reinstatement application, Myers provided Keenan with lengthy notes concerning his personal life and his desire to have his medical license reinstated. Of note, it seems that Myers originally sent his written notes to his attorney. Keenan asserted that Myers gave her the notes, but Myers asserted that his attorney gave Keenan the notes.

Regardless, the notes are included in the record on appeal. And in these notes, Myers explained that since his medical license revocation, he had learned a lot about his behaviors and motives. Citing to therapy sessions at PRC, Myers asserted that he now had "some tools to use to work better with hospital/office staff." Moreover, in these notes, Myers admitted that "what [he] did was wrong." He admitted that he should have been "fully open" with the PRC evaluators. And he admitted that he had crossed a boundary by engaging in a sexual relationship with L.T.

At the same time, however, Myers complained about a variety of issues. First, he made a number of complaints about PRC, including the following: (1) that the PRC evaluators never listened to him; (2) that the PRC evaluators came to their conclusions about him because it was "to their financial advantage to make this recommendation" to get "return business"; and (3) that the PRC evaluators wrongly questioned his honesty, not recognizing that he did not initially disclose his sexual relationship with L.T. "out of

14

respect for our/her privacy." Second, he complained about the Board's finding in his June 2013 consent order that he had not stayed in contact with the KMS and MAP. He alleged that he had tried to maintain contact with KMS and MAP, but Westgate had either been too busy to contact him or had ignored his attempts. Third, Myers complained that the "price" he had "paid" and was "pay[ing]" for his prior violations was "way too high!"

Next, Myers seemingly challenged Keenan's belief that he had a "chip missing" from him and that he was focused on "legalisms and the unfairness" of what had happened to him. In the note, he explained that after learning Keenan believed a "chip" was missing from him, he spoke to Keenan about this comment. He asserted that during their discussion, Keenan "apologized for having made [the 'chip missing' comment]." He also explained that he asked Keenan if she still felt like he was missing a "chip," and she responded, "No." As for focusing on legalisms and unfairness, Myers agreed that he was "very legal and [focused on] detail." But he alleged that he had to act in this manner because that was his "way of expressing [his] feelings and how [he had] felt about [his] treatment in the PRC and [the Board] systems."

Moreover, in these notes, Myers provided three explanations why he had not immediately sought therapy after surrendering his license. First, he asserted that he was not ready to benefit from therapy at that time because he was too "angry about [his] treatment . . . by PRC staff . . . and Carolyn Westgate." Second, he asserted that he had no time to attend therapy during 2013 and the majority of 2014 because he was still in the process of closing his solo practice, completing medical records from his solo practice, and settling bills from his solo practice. Third, he explained that although the PRC evaluators recommended that he seek therapy from one of three local therapists, he was dissatisfied with their recommendations for a variety of reasons.

About six months after Myers provided Keenan with these notes, Keenan wrote a letter to Myers' attorney summarizing Myers' progress during therapy. Keenan first

15

explained that she believed that Myers had a personality disorder, which was not otherwise specified, and obsessive-compulsive features. She also believed that Myers was a narcissist. She went on to state that Myers initially seemed very defensive and unable to connect to his negative experiences emotionally. But she believed that after "some time," Myers began to understand his negative feelings. She asserted that she and Myers had discussed recent experiences that established Myers had learned how to better respond to social situations.

Because Keenan believed that Myers had modified his prior inappropriate behavior, Keenan concluded that Myers could safely return to practicing medicine:

> "It is my opinion that Dr. Myers has learned, changed, and grown enough that he can practice medicine safely with continued support and monitoring. I am aware that the pressures of medical practice are more emotionally challenging than the activities he is now engaged in. I believe, however, that he has developed the skill and insight to recognize these challenges and deal with them early and appropriately."

*Application for Reinstatement of Medical License*

Once the Board lifted the stay order on Myers' application, the Board's disciplinary panel opposed Myers' medical license reinstatement. An Administrative Law Judge (ALJ) was assigned to hear Myers' case and the case proceeded to the discovery phase.

During discovery, Myers submitted to a deposition. At his August 2016 deposition, the Board's litigation attorney, who was representing the Board's disciplinary panel, asked Myers when he last visited J.R.'s Facebook page. Myers has not included his deposition in the record on appeal. And it is unclear how Myers exactly responded to this question. Nevertheless, it is undisputed that Myers did not honestly answer this question. Myers later explained that when he was asked this question, "it brought on a flood of emotions" because he knew from his PRC therapy that he should not have been looking

16

at J.R.'s Facebook page. But he also explained that he would always have "caring feelings" for J.R. Before signing his deposition, Myers admitted that he had last viewed J.R.'s Facebook page the night before his deposition.

On January 30, 2017, the ALJ held an evidentiary hearing on Myers' application for reinstatement. At the hearing, Myers testified on his own behalf. Suzanne Robinson—a registered nurse who worked at Mercy, B.R.—a person who attended AA meetings with Myers, Steven Newsome—Myers' longtime friend, and Keenan also testified on his behalf. The Board's disciplinary panel presented the testimony of Westgate, Hale, and two PRC psychiatrists. By the end of the hearing, the witnesses had outlined Myers' entire work and therapeutic history and the ALJ took the matter of Myers' medical license reinstatement application under advisement.

Ultimately, the ALJ denied Myers' application for reinstatement of his medical license. In the initial order, the ALJ considered Myers' reinstatement under the *Vakas* factors, which required the ALJ to evaluate the following: (1) Myers' present moral fitness; (2) Myers' recognition of wrongful conduct and the disrepute his wrongful conduct brought upon the profession; (3) Myers' rehabilitation efforts; (4) Myers' original misconduct; (5) Myers' conduct after discipline; (6) Myers' character, maturity, and experience when the Board revoked his license; (7) Myers' present competence to practice medicine; and (8) the time that had elapsed since Myers' original discipline. The ALJ found that Myers had not shown by clear and convincing evidence that he was sufficiently rehabilitated to justify reinstatement of his license under those factors. In reaching this decision, the ALJ found that Myers' repeated boundary violations, repeated failure to follow therapeutic recommendations, repeated violation of his April 2011 consent order and July 2010 MAP monitoring contract, and limited rehabilitation efforts supported the denial of his application. The ALJ also explained that she did not find Myers' testimony or his witnesses' testimony persuasive for a variety of reasons.

Myers petitioned the Board to review that ALJ's initial order denying his application for medical license reinstatement. In his petition, Myers asserted that the Board should reverse each of the ALJ's fact-findings because the ALJ "fail[ed] to give appropriate weight to facts that support[ed his] efforts toward rehabilitation" and overemphasized his "past violations." He also complained about the ALJ's credibility determinations against his witnesses. The Board held a hearing on Myers' petition for review, where Myers expounded upon his arguments. The disciplinary panel asked the Board to affirm the ALJ's denial of Myers' application for medical license reinstatement.

Eventually, the Board issued a final order. In this final order, the Board affirmed the ALJ's denial of his application for medical license reinstatement, adopting all of the ALJ's fact-findings. The Board emphasized that Myers had not followed many of the Rush, PEP, or PRC recommendations or participate in MAP monitoring. Moreover, it concluded that the evidence supported the ALJ's credibility determinations against Myers and his witnesses.

Myers next petitioned the Shawnee County District Court to review the Board's final order. In his petition, Myers argued that the district court should reverse the denial of his application for medical license reinstatement because the Board's fact-findings and credibility determinations were not supported by the evidence. He also challenged the Board's denial of his request to supplement the agency record with evidence indicating that he had completed more CME courses after the evidentiary hearing before the ALJ. The Board submitted a brief opposing Myers' petition for judicial review, asserting substantial evidence supported its fact-findings and credibility determinations.

The district court agreed with the Board. It summarized its reason for denying Myers' petition for judicial review as follows:

18

"Myers' burden was to demonstrate by clear and convincing evidence that he had been sufficiently rehabilitated to justify reinstatement. The Board applied the *Vakas* factors and concluded that Myers failed to meet that burden. The Board's findings under each *Vakas* factor and the Board's overall conclusion based on the sum total of the factors is supported by substantial evidence, is a proper application of law, and is not unreasonable, arbitrary, or capricious."

*Appeal to This Court*

On July 1, 2019, 28 days after the district court entered judgment against him, Myers' attorney electronically filed a notice appealing this judgment. But the Shawnee County District Court Clerk rejected Myers' notice of appeal about two hours after it was filed. When the clerk rejected Myers' notice of appeal, it e-mailed Myers' attorney about the rejection. In the rejection e-mail, the clerk explained that Myers' notice of appeal lacked page numbers contrary to the Third Judicial District Court's Local Rule 3.109. This rule provided that "[e]very page of every pleading must be numbered, including any attachment."

Despite the clerk's immediate rejection of Myers' notice of appeal, Myers' attorney did not file a notice of appeal including page numbers until August 5, 2019. At that point, 63 days had passed since the district court entered judgment against Myers.

Next, once Myers docketed his appeal with this court, we ordered Myers to explain how we had jurisdiction over his appeal since he filed it outside of K.S.A. 60-2103(a)'s 30-day time limits. Myers responded that this court had jurisdiction over his appeal for two reasons. First, he asserted that the clerk had wrongly rejected his first notice of appeal for lacking page numbers because Supreme Court Rule 23(c)(1) (2020 Kan. S. Ct. R. 76) allowed clerks to return filings for only certain reasons, and none of those reasons involved a filing lacking page numbers. Second, he asserted that the page number defect in his first notice of appeal was a technical error that did not deprive this

court of jurisdiction. Thus, he argued that his untimely notice of appeal with page numbers cured the error within his timely notice of appeal lacking page numbers.

Following Myers' response, this court retained Myers' appeal on the issue of "whether an untimely jurisdictional filing can be excused by a timely but unsuccessful electronic filing."

*Does This Court Have Jurisdiction?*

In his appellant's brief, Myers contends that the clerk erred by rejecting his notice of appeal for lacking page numbers because the page number defect was a technical error that did not deprive this court of jurisdiction. The Board responds that Myers' argument is meritless because his argument hinges on misconstruing Kansas caselaw.

Nevertheless, after the parties made their oral arguments to this court, this court had additional questions concerning the issue of jurisdiction. As a result, following oral arguments, we issued two orders requiring the parties to submit supplemental briefing on the issue of jurisdiction. In the second order, we sua sponte questioned whether Kansas Supreme Court Rule 2.02 (2020 Kan. S. Ct. R. 14) barred the Shawnee County District Court Clerk from rejecting Myers' notice of appeal under Local Rule 3.109.

Having reviewed the parties' supplemental briefs on Rule 2.02, we turn to the question whether Rule 2.02 barred the Shawnee County District Court Clerk from rejecting Myers' timely notice of appeal for lacking page numbers. Because the clerk's rejection of Myers' timely filed notice of appeal for lacking page numbers violated Rule 2.02, we hold that Myers' timely filed notice of appeal lacking page numbers conferred jurisdiction to this court.

*Law on Jurisdiction*

K.S.A. 60-2103(a) provides that in civil cases, an appellant must file his or her notice of appeal with the district court no later than 30 days after the district court enters judgment. Absent certain exceptions, Kansas appellate courts have jurisdiction over an appeal only if the appellant complies with K.S.A. 60-2103 because the right to appeal is entirely statutory. *Wiechman v. Huddleston*, 304 Kan. 80, 86-87, 370 P.3d 1194 (2016). Moreover, if the record indicates that jurisdiction does not exist, this court has a duty to question the existence of jurisdiction on its own initiative. 304 Kan. at 84-85.

Meanwhile, Kansas Supreme Court Rule 2.02 (2020 Kan. S. Ct. R. 14) states: "In a case in which a direct appeal to the Supreme Court is not permitted, the notice of appeal must be filed in the district court, be under the caption of the district court case, and be in substantial compliance with the judicial council form." Significantly, Rule 2.02's language mirrors part of K.S.A. 60-2103(b). K.S.A. 60-2103(b) provides the following:

> "The notice of appeal shall specify the parties taking the appeal; shall designate the judgment or part thereof appealed from, and shall name the appellate court to which the appeal is taken. The appealing party shall cause notice of the appeal to be served upon all other parties to the judgment as provided in K.S.A. 60-205, and amendments thereto, but such party's failure so to do does not affect the validity of the appeal."

Whether this court has jurisdiction over an appeal is a question of law over which this court exercises de novo review. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017).

*Supreme Court Rule 2.02*

In his supplemental brief, Myers contends that Local Rule 3.109's page number requirement was an impermissible jurisdictional obstacle that violated Rule 2.02 because

21

Rule 2.02 contains no page number requirement. He then argues that because his timely notice of appeal lacking page numbers complied with Rule 2.02, it conferred jurisdiction to this court despite lacking page numbers.

In its supplemental brief, the Board does not dispute that Myers' timely notice of appeal lacking page numbers facially complied with Rule 2.02. Even so, the Board counters that Rule 2.02 only applies to notices of appeal that are actually filed with a district court. According to the Board, this means that Rule 2.02 does not apply to Myers' timely notice of appeal lacking page numbers as it was rejected by the clerk and, therefore, never filed with the district court.

The Board also argues that a reasonable reading of Rule 2.02 establishes that Rule 2.02 merely concerns the minimum substantive requirements of a notice of appeal. The Board argues that Rule 2.02's minimum substantive requirements of a notice of appeal do not prohibit district courts from implementing local rules concerning additional administrative filing requirements. The Board then describes Local Rule 3.109 as "not add[ing] jurisdictional elements to Rule 2.02 any more than any other administrative filing rule does."

Interpretation of a Kansas Supreme Court Rule requires an appellate court to apply the rules of statutory interpretation. *Kansas Judicial Review v. Stout*, 287 Kan. 450, 460, 196 P.3d 1162 (2008). Under those rules, an appellate court must interpret a Supreme Court's rule in a manner consistent with our Supreme Court's intent when enacting the rule. To determine our Supreme Court's intent, we must look to the plain language of the disputed rule. 287 Kan. at 460. If the plain language of the disputed rule is clear and unambiguous, then an appellate court must interpret the disputed rule in accordance with its plain language. 287 Kan. at 460.

22

Here, Rule 2.02 is a specific rule regarding the form of a notice of appeal to the Kansas Court of Appeals. But Rule 2.02's plain language does not include a page number requirement. Also, the judicial council form referenced in Rule 2.02 does not include page numbers. Of note, K.S.A. 60-2103(b) is also a specific rule regarding appellate procedure, which does not include a page number requirement. In short, based on the plain language of Rule 2.02 and K.S.A. 60-2103(b), it is readily apparent that including page numbers in a notice of appeal is not a jurisdictional requirement of a notice of appeal filing.

Next, our review of Kansas caselaw has revealed no Supreme Court case in which the court has considered Rule 2.02's application in the context of a district court clerk rejecting a party's notice of appeal for violating a local rule. Nonetheless, our Supreme Court has held that notices of appeal that substantially comply with Rule 2.02's requirements are sufficient to convey appellate jurisdiction to this court. See *State v. Hurla*, 274 Kan. 725, 728, 56 P.3d 252 (2002).

Also, our Supreme Court has consistently interpreted K.S.A. 60-2103(b) liberally to ensure justice in all proceedings. *State v. Laurel*, 299 Kan. 668, 673, 325 P.3d 1154 (2014). It has "[o]bserv[ed] that a notice of appeal need not be overly technical or detailed" and has "generally considered whether the State has been prejudiced by a defendant's timely filed but otherwise faulty notice of appeal." 299 Kan. at 674.

Thus, under our Supreme Court precedent, an appellate court should avoid dismissing an appellant's case for lack of jurisdiction based on technical violations of notice of appeal filing requirements. Indeed, under that precedent, we must hold that a notice of appeal confers jurisdiction to this court when the contents of the notice of appeal substantially complies with Rule 2.02. As a result, a review of our Supreme Court precedent offers further support that the inclusion of page numbers on a notice of appeal is not a jurisdictional requirement for filing a notice of appeal.

23

As for the Board's arguments about Rule 2.02's application, we determine that those arguments are unpersuasive. To begin with, despite the Board's argument to the contrary, nothing within the plain language of Rule 2.02 states that the rule applies only to notices of appeal that the district court clerk accepted and then filed. Furthermore, assuming the clerk wrongly rejected Myers' notice of appeal, it would be patently unfair for this court to ignore any of Myers' jurisdictional arguments just because the clerk's errant rejection of his notice of appeal meant that it was never filed with the district court. As a result, we reject this argument.

Next, although the Board contends that the plain language of Rule 2.02 does not conflict with Local Rule 3.109's "administrative filing rule," this is not true. The Board's argument ignores both the plain language of Rule 2.02, which has no page number requirement, and our Supreme Court precedent indicating that notices of appeal complying with Rule 2.02 are sufficient to convey appellate jurisdiction to this court. See *Hurla*, 274 Kan. at 728. Also, the Board's argument ignores that our Supreme Court has held that "[a] local rule that adds requirements to the statutory scheme and creates jurisdictional obstacles" is invalid. *In re Estate of Clare*, 305 Kan. 967, 971, 389 P.3d 1274 (2017).

Indeed, our Supreme Court's decision in *In re Estate of Clare*, which Myers relies on in his supplemental brief, is instructive on this issue. There, the daughter of the decedent timely made a claim against the decedent's estate under the applicable statute, K.S.A. 59-2239(1). Nevertheless, the daughter did not obtain a signed order for hearing in accordance with a local rule. Based on this failure, the district court dismissed the daughter's claim as untimely. Yet, our Supreme Court reversed the district court because the daughter had made her claim within the applicable statutory time limitations. In doing so, our Supreme Court made the following holding: "Had [the daughter] taken the same action under the same statute but in a different county she would have faced no

24

jurisdictional bar. A local rule that adds requirements to the statutory scheme and creates jurisdictional obstacles conflicts with the State probate code and is therefore invalid." 305 Kan. at 971.

Although the *In re Estate of Clare* case was a probate case, its holding stands for the proposition that local rules that add jurisdictional obstacles that conflict with a statute are invalid. Here, even though the Board contends that Local Rule 3.109's application does not conflict with Rule 2.02, the Board further contends that Myers' failure to include the page numbers in his timely notice of appeal in accordance with Local Rule 3.109 prevents this court from obtaining jurisdiction over Myers' appeal. By arguing that Myers' violation of Local Rule 3.109 prevents this court from obtaining jurisdiction, the Board implicitly recognizes that Local Rule 3.109 created an additional jurisdictional obstacle for Myers. This, however, is the very type of local rule our Supreme Court held invalid in *In re Estate of Clare*. As a result, we rely on *In re Estate of Clare* to reject the Board's contention that Local Rule 3.109's application does not conflict with Rule 2.02.

In summary, the plain language of Rule 2.02 does not provide that the inclusion of page numbers in a notice of appeal is a jurisdictional requirement. As a result, Local Rule 3.109's page number requirement cannot be used to create an additional jurisdictional obstacle for an appellant when filing a notice of appeal. Nevertheless, in this case, the Board asks this court to hold that Myers' failure to comply with Local Rule 3.109's page number requirement when submitting his timely notice of appeal prevents this court from obtaining jurisdiction over Myers' appeal. Under Rule 2.02's plain language and our Supreme Court's precedent, such a holding is impermissible.

Thus, because Myers' timely notice of appeal complied with Rule 2.02's jurisdictional requirements, we conclude that this court has jurisdiction to consider the merits of Myers' underlying arguments about the Board's denial of Myers' application of medical license reinstatement. Because we conclude that this court has jurisdiction to

25

consider the merits of Myers' underlying arguments, we need not consider the other jurisdictional arguments that Myers has raised on appeal.

*Did the Board Err by Denying Myers' Application for Medical License Reinstatement?*

Now that we have established that we have jurisdiction over Myers' appeal, we must consider Myers' underlying arguments regarding the Board's denial of his medical license reinstatement. Myers argues that the Board erred when denying his medical license reinstatement application in three ways:  First, Myers argues that the Board erred by accepting the ALJ's credibility determinations against his witnesses, including himself. Second, he argues that the Board wrongly found that he attempted to shift his burden of proof while making his rehabilitation arguments. Third, he argues that the Board erred by finding him insufficiently rehabilitated under our Supreme Court's *Vakas* factors.

Because Myers contends that the Board erred when denying his medical license reinstatement application, Myers further contends that the district court erred by affirming the Board. As a result, Myers argues that we should reverse the district court, vacate the order denying his medical license reinstatement, and remand to the Board with directions to reinstate his medical license.

The Board counters that the district court correctly affirmed its order denying Myers' application for medical license reinstatement. The Board's responses to Myers' arguments are often very brief. In short, the Board generally argues that it correctly applied the law and its findings were supported by substantial evidence.

Our analysis establishes that the Board properly denied Myers' medical license reinstatement application. Thus, we affirm the denial of Myers' medical license reinstatement application.

*Law on Administrative Appeals from the Board*

The KHAA, K.S.A. 65-2801 et seq., governs the practice of healing arts within Kansas. Through K.S.A. 65-2812, the Legislature provided the Board with the authority to administer the KHAA. Moreover, under K.S.A. 65-2801, the Legislature established that the practice of healing arts is a privilege, not a right.

K.S.A. 65-2844 of the KHAA governs applications for medical license reinstatement. In relevant part, K.S.A. 65-2844 states:

> "The burden of proof by clear and convincing evidence shall be on the applicant to show sufficient rehabilitation to justify reinstatement. . . . All proceedings conducted on an application for reinstatement shall be in accordance with the provisions of the Kansas administrative procedure act and shall be reviewable in accordance with the Kansas judicial review act."

The clear and convincing evidence standard of proof requires the fact-finder to believe that it is highly probable that the facts asserted are true. *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018).

The Kansas Administrative Procedure Act (KAPA) provides that when an agency head, like the Board, reviews an ALJ's initial order, the agency head exercises de novo review. K.S.A. 77-527(d). Nevertheless, the KAPA further provides that when reviewing the initial order, the agency head "shall give due regard to the [ALJ's] opportunity to observe the witnesses and to determine the credibility of witnesses." K.S.A. 77-527(d).

Next, both the district court and this court exercise the same statutory limited review as provided under the Kansas Judicial Review Act (KJRA) when reviewing an agency decision. *Carlson Auction Service, Inc. v. Kansas Corporation Comm'n*, 55 Kan.

27

App. 2d 345, 349, 413 P.3d 448 (2018). Under the KJRA, neither a district court nor an appellate court may grant relief unless the agency violated one or more provisions of K.S.A. 77-621(c)(1)-(8). Reversible violations include agency decisions based on errors of fact and agency decisions that are otherwise unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(7), (8). The party asserting error maintains the burden of persuasion upon appeal. K.S.A. 77-621(a)(1).

On appeal, Myers' primary arguments concern whether the ALJ and Board made factual errors. When reviewing an agency decision for an error of fact, an appellate court reviews an agency fact-finding for "substantial" evidence. Under K.S.A. 77-621(c)(7) of the KJRA, evidence is substantial when it supports the agency's fact-finding under the appropriate standard of proof when viewed "in light of the record as a whole." To review evidence "in light of the record as a whole," an appellate court must consider the adequacy of the evidence both supporting and detracting from an agency's fact-finding. But when reviewing this evidence, an appellate court "shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

This court has previously explained that "[t]o find a lack of substantial evidence, . . . the decision must be so wide of the mark as to be outside the realm of fair debate." *In re Equalization of Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 137, 275 P.3d 56 (2012). Moreover, our Supreme Court has determined that "[w]hether substantial competent evidence exists is a question of law." *Redd v. Kansas Truck Center*, 291 Kan. 176, 182, 239 P.3d 66 (2010).

Myers' remaining arguments concern whether the ALJ and Board made arbitrary decisions. When determining whether an agency made an arbitrary decision, appellate courts consider whether the agency action should have been taken or was justified. *Lario Oil & Gas Co. v. Kansas Corp. Comm'n*, 57 Kan. App. 2d 184, 205, 450 P.3d 353 (2019).

28

*Credibility Findings*

Myers first challenges the Board's adoption of the ALJ's credibility determinations against his witnesses. In making this argument, Myers contends that he is not asking this court to make its own credibility determinations. Instead, he asks this court to review the ALJ's credibility determinations about himself, Keenan, B.R., Robinson, and Newsome for substantial evidence and arbitrariness. According to Myers, none of the ALJ's credibility determinations were supported by substantial evidence, making them arbitrary. Then, Myers argues that the Board erred when it adopted the ALJ's credibility determinations, and the district court erred when it affirmed the Board's adoption of the ALJ's credibility determinations.

The Board responds that it did not err by adopting the ALJ's credibility determinations because K.S.A. 77-527(d) of KAPA provides that it must "give due regard to the [ALJ's] opportunity to observe the witnesses and to determine the credibility of witnesses." Nevertheless, the Board's argument ignores the plain language of K.S.A. 77-621(d) of the KJRA. Once again, that provision states that when considering the existence of substantial evidence in light of the record as a whole, courts must consider "any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact." K.S.A. 77-621(d).

As a result, we may consider whether substantial evidence supports the ALJ's credibility determinations. Still, because K.S.A. 77-621(d) of the KJRA further provides that courts "shall not reweigh the evidence or engage in de novo review" when reviewing the evidence in light of the record as a whole, our review is strictly limited to whether substantial evidence supports the ALJ's credibility determinations. Although Myers also argues that the ALJ's findings were arbitrary, it necessarily follows that a credibility determination supported by substantial evidence is reasonable.

29

*Myers' testimony*

Myers complains that the ALJ wrongly discredited his testimony because during his testimony, he sometimes provided nonresponsive answers. Myers does not contest that some of his answers to the ALJ's and the Board's litigation attorney's questioning seemed nonresponsive. Nonetheless, he argues that when the ALJ "called him out on his [seemingly nonresponsive] answers, [the ALJ] learned that his answers were responsive." Thus, Myers argues that his nonresponsive answers did not invalidate his testimony.

In the initial order, the ALJ stated that she found Myers' testimony about his current moral fitness "lacking in credibility and persuasiveness," in part, because of his nonresponsive answers. But the ALJ also made a general credibility determination against Myers based on his dishonest deposition testimony. For example, Myers lied during his August 2016 deposition when the Board's litigation attorney asked him about when he last visited J.R.'s Facebook page. This deposition occurred just five months before his evidentiary hearing. Also, the ALJ noted the timing of Myers' dishonest deposition testimony as evidence of his lack of credibility.

So, the ALJ made a credibility determination against Myers for a reason he does not challenge on appeal. It is a well-known rule that an issue not briefed by an appellant is deemed waived and abandoned. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Here, by not challenging the ALJ's credibility determination against him based on his dishonest deposition testimony, Myers has waived any argument that the ALJ erred by making this credibility determination.

Also, it is readily apparent that any attempt by Myers to dispute the ALJ's credibility determination against him based on his dishonest deposition testimony would fail because he explicitly concedes that he lied during his deposition testimony. As a

result, even if the ALJ should not have made a credibility determination against Myers because he sometimes gave nonresponsive answers, Myers' dishonesty during his deposition testimony adequately supported the ALJ's credibility determination against Myers. In turn, the Board did not err by adopting the ALJ's credibility determination against Myers.

*Keenan's testimony*

Myers' primary argument about the Board's adoption of the ALJ's credibility determinations concerns Keenan's testimony. Myers argues that the ALJ discounted Keenan's testimony because she believed that Keenan was "'dismissive' when answering [her] questions." Myers asserts that the ALJ's credibility determination against Keenan was based on unfair prejudice stemming from her dislike of Keenan's responses to her questioning. Also, Myers argues that "[o]ther than questions regarding [AA]," he can only "speculate" why the ALJ believed Keenan's responses were "dismissive."

In the initial order, the ALJ described Keenan's responses to her questioning as "dismissive." But the ALJ also expressed concern that Keenan "exhibited no real recognition that [Myers'] choice to attend [AA] meetings rather than those recommended by other professionals might be problematic." The ALJ noted that "other professionals" had not recommended Myers' AA attendance. Instead, these other professionals believed that Myers should be attending therapy groups designed to help persons with boundary issues, like Sex Addicts Anonymous. Based on the preceding, the ALJ found Keenan's testimony, including her opinion that Myers could now "maneuver relationships" while practicing medicine "without posing a danger to the public," "unpersuasive."

Thus, contrary to Myers' argument, the ALJ did not take issue with Keenan's testimony just because Keenan's responses to her questions about AA were "dismissive." The ALJ also took issue with Keenan's testimony because her opinions about Myers' AA

31

attendance differed from other professionals. Accordingly, Myers' argument about the ALJ's credibility determination against Keenan ignores key evidence the ALJ relied on when making her credibility determination against Keenan.

At this juncture, we also point out that Myers' argument completely ignores the Board's supplemental fact-findings supporting the ALJ's credibility determination against Keenan. In the final order, the Board explained that the ALJ's credibility determination against Keenan was warranted not just because of her opinions on Myers' AA attendance, but also because of the following:

> "Dr. Keenan's testimony and opinion is contrary to the PRC recommendation for a follow up evaluation. PRC was the third multidisciplinary evaluation. The PRC team included psychologist(s) and psychiatrist(s). Dr. Keenan, Ph.D., psychologist, served in a therapy role and not in a forensic evaluation role. Prior multidisciplinary evaluations concluded that [Myers] presented significant, deep rooted, and concerning behaviors or conduct which warranted a multiprong remediation approach."

In short, substantial evidence supported the ALJ's credibility determination against Keenan based on her opinions differing from other professionals. So the Board did not err by adopting the ALJ's credibility determination against Keenan or by making its additional fact-findings.

*B.R.'s, Suzanne Robinson's, and Steven Newsome's Testimony*

Myers' remaining credibility arguments involve the ALJ's credibility determination against B.R., Suzanne Robinson, and Steven Newsome. Highly summarized, B.R. testified about attending AA meetings with Myers over the past six years. Robinson, a nurse who worked at Mercy, testified about Myers' volunteer work at Mercy since December 2014. Newsome, Myers' friend and former coworker from ACH, testified about Myers' improved behavior in social situations. Although B.R., Robinson,

32

and Newsome did not testify about Myers' current fitness to practice medicine, they all had positive opinions about Myers as a person.

In his brief, Myers complains that the ALJ made credibility determinations against B.R., Robinson, and Newsome without adequate explanation. He notes that in the initial order, the ALJ simply stated that she did not find Myers' remaining witnesses' testimony "persuasive." Myers contends that the ALJ's credibility determinations against B.R., Robinson, and Newsome were unwarranted because the Board presented no evidence contradicting B.R.'s, Robinson's, and Newsome's positive testimony about his character.

But Myers misconstrues the ALJ's findings about B.R.'s, Robinson's, and Newsome's testimony. In the initial order, the ALJ noted Myers' participation in AA and volunteering at Mercy. The ALJ then found the following: "There was some evidence presented during the hearing that Dr. Myers is now taking some positive steps in his life. However, these recent changes are insufficient to cause the *Vakas* factors to weigh in favor of reinstating his license."

A judgment on witness credibility involves the veracity or believability of evidence. See Black's Law Dictionary 463 (11th ed. 2019) (defining "credibility" as "[t]he quality that makes something [as a witness or some evidence] worthy of belief"). Here, the ALJ was not questioning the veracity or believability of B.R.'s, Robinson's, and Newsome's testimony. Instead, the ALJ simply did not find B.R.'s testimony about Myers' AA attendance, Robinson's testimony about Myers' volunteering, and Newsome's testimony about Myers' improved behavior in social situations persuasive evidence on Myers' current fitness to practice medicine. Indeed, the district court reached the same conclusion when affirming the Board: "[I]t is likely that the ALJ's credibility finding was as much an observation that the evidence presented by some of [Myers'] witnesses was of little consequence to the reinstatement decision at hand."

Thus, a review of the ALJ's disputed findings regarding B.R.'s, Robinson's, and Newsome's testimony establishes that the ALJ did not make a credibility determination against B.R., Robinson, or Newsome. Instead, she merely deemed their testimony unpersuasive as to Myers' current fitness to practice medicine. Because the ALJ did not make a credibility determination against B.R., Robinson, or Newsome, Myers' argument that substantial evidence did not support the ALJ's credibility determination against B.R., Robinson, and Newsome is baseless.

*Burden Shifting Finding*

Before the Board, both in its petition for judicial review and at oral arguments, Myers stressed that the Board's disciplinary panel never presented evidence directly rebutting some of his evidence about his more recent rehabilitation efforts. He asserted that his witnesses testified about his current fitness while the Board's disciplinary panel's witnesses testified about his past problems. In his petition for review, Myers alleged that the ALJ's fact-findings were unsupported because she discredited his witnesses' testimony when the Board's disciplinary panel never presented direct evidence rebutting his witnesses' testimony. Furthermore, Myers repeated this argument at his hearing before the Board.

In its final order, the Board noted Myers' argument about the disciplinary panel's failure to present evidence on his more recent rehabilitation efforts. But the Board rejected Myers' argument for the following reason:

> "[Myers'] argument . . . is contrary to the applicable statute that tasks [him] with the burden to prove, by clear and convincing evidence, there is sufficient rehabilitation to justify reinstatement. [Myers'] attempt to escape this responsibility reflects professionalism concerns observed by Rush in the 2006 evaluation that [he] does not take responsibility, externalizes blame, and has an unrealistic sense that others should unquestionably accept and adopt his position."

34

Now, on appeal, Myers contends that the Board erred "when it concluded as law that [he] attempted to shift the burden of proof." Myers challenges whether the facts supported the Board's finding that he sought to shift the burden of proof away from himself. Myers asserts that he merely sought to show that the Board's disciplinary panel had not rebutted his evidence regarding "his productive activities over the past several months." Also, he argues that even if he sought to shift his burden of proof, the Board should not have found that his burden shifting reflected poorly on his rehabilitation efforts. He points out that it was his attorney, not him, who made the burden shifting arguments.

Yet, the preceding arguments are unpersuasive. In "our system of representative litigation, . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' [Citation omitted.]" *Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S. Ct. 1386, 1390, 8 L. Ed. 2d 734 (1962). Moreover, Myers carried the burden of proof under both K.S.A. 65-2844 and K.S.A. 77-621(a)(1). As a result, both the ALJ and the Board could deny Myers' application for medical license reinstatement without the Board's disciplinary panel ever presenting any evidence.

Although we note our concurring panel member's concern with attributing Myers' attorney's arguments before the ALJ and Board as evidence of Myers' flawed character, we do not share this concern. We find no evidence in the record that the ALJ or Board ruled against Myers because either the ALJ or Board disliked Myers' attorney's "approach in questioning a particular witness" or approach in "crafting a theme" for Myers' case. Slip op. at 65 (Atcheson, J., concurring). Instead, the ALJ and Board found that Myers' attorney's burden shifting arguments, which we presume Myers knew about and was therefore bound by, weighed against Myers because such arguments constituted evidence

35

of Myers' continual complaints about what other parties had not done instead of simply taking responsibility for his prior problematic conduct.

We further note that Myers has employed the same attorney throughout the duration of this case. Clearly, if Myers believed that his attorney wrongly represented his position to the ALJ or Board, Myers could have hired a new attorney for appeal. But he did not do so. Thus, we have no difficulty attributing Myers' attorney's burden shifting arguments to Myers. And we therefore reject Myers' burden shifting argument.

Vakas *Factors Findings*

Last, Myers challenges the Board's finding that the "*Vakas* factors" weighed against reinstatement of his medical license application. In *Vakas*, our Supreme Court explained that although K.S.A. 65-2844 governs reinstatement of medical licenses, K.S.A. 65-2844, "when viewed alone, does not provide notice of what conduct will allow or prevent reinstatement." 248 Kan. at 601. Because K.S.A. 65-2844 provided no guidance regarding what conduct would allow or prevent reinstatement, our Supreme Court sought to provide such guidance. Ultimately, our Supreme Court held that the determination whether to reinstate a license under the KHAA is comparable to the determination whether to reinstate a disbarred attorney's law license because both the Board and the Kansas Supreme Court have the same duty "'to preserve the high ethical and moral standards required before a person is entitled to enjoy the privilege'" of practicing medicine and law, respectively. 248 Kan. at 600.

As a result, our Supreme Court held that when deciding whether to reinstate a doctor's medical license, the Board may consider the same factors it considers when deciding whether to reinstate an attorney's law license, explaining:

36

"In [*State v. Russo*, 230 Kan. 5, 630 P.2d 711 (1981)], this court noted 'that each petition for reinstatement [of law license] must be considered on its own merits and that such decisions must be made on a case by case basis depending upon the facts involved.' 230 Kan. at 12. The court set out eight factors to be considered in determining whether to grant reinstatement. The factors include: (1) the present moral fitness of the petitioner, (2) the demonstrated consciousness of the wrongful conduct and disrepute which the conduct has brought the profession, (3) the extent of petitioner's rehabilitation, (4) the seriousness of the original misconduct, (5) conduct subsequent to discipline, (6) the time which has elapsed since the original discipline, (7) the petitioner's character, maturity, and experience at the time of disbarment, and (8) the petitioner's present competence in legal skills. 230 Kan. at 9. These eight factors are just as relevant in determining if a license to practice medicine and surgery should be reinstated." 248 Kan. at 600.

In both his brief before the ALJ and the Board, Myers argued that his medical license should be reinstated because he had established his fitness under the *Vakas* factors. With the exception of the factors concerning the time that elapsed since his original discipline and his character, maturity, and experience when the Board revoked his medical license, Myers argued that each *Vakas* factor weighed in favor of reinstating his medical license.

As a result, both the ALJ in its initial order and the Board in its final order based its decision whether to deny Myers' application for medical license reinstatement under the *Vakas* factors. Both the ALJ and the Board found that Myers failed to establish by clear and convincing evidence that any *Vakas* factor weighed in favor of his medical license reinstatement.

On appeal, Myers challenges the Board's adoption of the ALJ's findings against him under each *Vakas* factor. Myers asserts that contrary to the Board's findings, most *Vakas* factors weighed in favor of reinstating his medical license. For this reason, he argues that the Board's *Vakas* factor findings were not supported by substantial evidence

or otherwise unreasonable. He therefore implicitly argues that the district court erred by affirming the Board's findings against him under the *Vakas* factors.

*Myers' present moral fitness*

Before the ALJ, Myers argued that he was presently morally fit based on his decision to correct his false deposition testimony. He also cited to an incident when he turned a baseball glove into the lost and found. In the initial order, the ALJ found that Myers failed to establish his present moral fitness by clear and convincing evidence by making these arguments. Moreover, it questioned Myers' present moral fitness because Myers provided dishonest deposition testimony, provided nonresponsive answers to some questions, and used the names of AA attendees in his notes. As to this last point, the ALJ believed that Myers' reference to the AA attendees' names in his notes violated AA's anonymity policy.

When Myers petitioned the Board to review the ALJ's initial order, he asserted the ALJ's findings against him were not supported by the evidence. In addition to citing to the correction of his dishonest deposition testimony, Myers cited to his progress in therapy with Keenan, his volunteer work at Mercy, and his AA attendance as evidence of his present moral fitness. But the Board affirmed the ALJ's decision to weigh this *Vakas* factor against Myers. In doing so, the Board made additional findings against Myers. Although the Board "commended" Myers' work with Keenan and found that attending AA "may have been appropriate," it further found that Myers' therapy with Keenan and AA attendance "pale[d] in comparison [to] the monitoring, therapy, and remediation recommendations by three separate and independent multidisciplinary entities made over a period of years." The Board concluded that therapy and AA attendance were not a substitute for the recommendations made by Rush, PEP, and PRC or monitoring by MAP.

On appeal, Myers asserts that substantial evidence did not support the Board's finding that he had not proven his current moral fitness by clear and convincing evidence. To support his argument, Myers again points to his correction of his dishonest deposition testimony, therapy with Keenan, volunteer work at Mercy, and AA attendance as evidence of his current moral fitness. Regarding his deposition testimony, Myers argues that correcting his deposition testimony showed "his tendency of honesty, even to his detriment." Regarding his AA attendance, Myers argues that his interaction with an AA member who was upset to learn that he was a stalker showed his "dedication to doing the right thing."

At the same time, Myers argues that the ALJ and Board did not credit him enough for his progress in therapy and volunteer work at Mercy. Myers also takes issue with the ALJ's finding that his note taking at his AA meetings violated AA's anonymity policy and, thus, reflected poorly on his current moral fitness. Also, Myers contends that the ALJ could not consider his nonresponsive answers as evidence of his current moral unfitness. Thus, Myers' appellate arguments emphasize facts that he believes establishes his current moral fitness, that is, his deposition testimony correction, therapy progress, volunteer work at Mercy, and AA attendance.

Yet, in making these arguments, Myers ignores that the only arguments he made before the ALJ concerned his correction of his dishonest deposition testimony and turning a baseball glove into the lost and found. Absent certain exceptions, a party appealing an agency decision may not raise arguments they did not make before the agency. K.S.A. 77-617. Here, although Myers added to his arguments concerning his present moral fitness before the Board and the ALJ, Myers' arguments were very limited. Myers cannot sandbag the ALJ's finding that he had not established his present moral fitness by clear and convincing evidence, nor the Board's decision affirming that finding, by raising arguments he did not raise before the ALJ. See, e.g., *McPhail v. Municipality of Culebra*, 598 F.2d 603, 607 (1st Cir. 1979) (holding that "[a] party may not 'sandbag'

39

his case by presenting one theory in the trial court and then arguing for another on appeal").

Notwithstanding the preceding, in making his arguments, Myers never addresses the Board's finding regarding his failure to comply with the recommendations made by Rush, PEP, and PRC evaluators. Yet, Myers did not comply with numerous recommendations, including continuation of MAP monitoring, attendance of a support group for persons with boundary problems, attendance of a CME course on leadership, and returning to the PEP and PRC for a secondary evaluation. What is more, Myers' discontinuation of MAP monitoring violated his April 2011 consent order. Myers' April 2011 consent order stated that Myers' MAP monitoring contract was not self-terminating.

Although Myers correctly points out that the Rush, PEP, and PRC evaluators made recommendations that were not requirements, Myers fails to grasp that compliance with those recommendations would have shown his desire to address his moral fitness problems. Myers' arguments ignore that the recommendations were made to address his specific professionalism and boundary issues. Furthermore, Myers' arguments do not account for his failure to comply with his MAP monitoring contract. In short, absent clear and convincing evidence establishing otherwise, his failure to voluntarily comply with the Rush, PEP, and PRC recommendations and his MAP monitoring contract suggests that he continues to suffer from the same professionalism and boundary issues that resulted in the revocation of his medical license.

We also reject Myers' contention that his interaction with an AA attendee who became upset with him after learning that he was a stalker constitutes evidence of his current moral fitness. Evidently, an AA attendee, who had previously been stalked, became upset during a meeting after Myers discussed his history of stalking. Myers contends that upon learning that the attendee was upset, Myers and some other AA attendees spoke to the upset AA attendee. According to Myers, that attendee "now

appears comfortable" with Myers. As a result, he contends that his interaction with the AA attendee shows his newfound empathy for others and willingness to "do[] the right thing."

Clearly, however, Myers' interaction with the AA attendee is problematic. Myers' contention that his interaction with the attendee somehow shows his current moral fitness ignores that Myers entered the attendee's safe space, a space where she could openly discuss her alcohol-related problems. And we take issue with Myers' decision to emphasize the AA attendee's alleged mental health issues when making his arguments. In short, the fact the AA attendee had mental health issues did not lessen Myers' intrusion into the AA attendee's emotional vulnerabilities on learning that he was a stalker.

To summarize, except for Myers' arguments concerning the correction of his dishonest deposition testimony and turning a baseball glove into lost and found, he did not raise any of his current moral fitness arguments (therapy progress, volunteer work at Mercy, and AA attendance) before the ALJ. Because he did not raise those arguments before the ALJ, it affords no basis for him to complain on appeal. Yet, regardless of the preceding, Myers' failure to comply with professional recommendations, failure to comply with his MAP monitoring contract, and failure to recognize his ongoing professionalism and boundary issues negates his present moral fitness arguments. For these reasons, substantial evidence supports the Board's finding that Myers had not established his present moral fitness by clear and convincing evidence.

> *Myers' recognition of wrongful conduct and the disrepute such conduct*
> *caused on the medical profession*

Myers asserted below that his testimony about recognizing his wrongful conduct as well as his interaction with an AA attendee who became upset upon learning that he was a stalker established by clear and convincing evidence his recognition of his previous

41

wrongful conduct. The ALJ rejected Myers' contention that he had sufficiently recognized his wrongful conduct because the evidence supported that he had "a repeated pattern of failing to recognize boundaries both in a professional and personal capacity[,] which lead directly to his surrender of licensure in the first place." The ALJ also rejected Myers' reliance on his own testimony as evidence that he had recognized his wrongful conduct because she discredited all of Myers' testimony as self-serving in light of his dishonest deposition testimony. The Board agreed with the ALJ's fact-findings.

As he did below on appeal, Myers argues that his own testimony and his interaction with the AA attendee who became upset upon learning that he was a stalker establishes his recognition of his previous wrongful conduct by clear and convincing evidence. Additionally, Myers challenges the ALJ's and Board's credibility determination against him, asserting that the ALJ and Board could not reject his testimony just because they believed it was self-serving.

Yet, Myers' argument ignores that the ALJ and Board made a credibility determination against him because of his dishonest deposition testimony. As considered already, substantial evidence supports the credibility determination against Myers based on his dishonest deposition testimony because it is undisputed that Myers lied during his August 2016 deposition.

Also, Myers' argument ignores that the topic he concealed—when he last visited J.R.'s Facebook page—provided additional support for the Board's finding. According to Myers, he lied during his deposition because he became overwhelmed with emotion when the Board's litigation attorney asked him when he last visited J.R.'s Facebook page. At his evidentiary hearing, Myers further explained that he became overwhelmed with emotion because he would always have "caring feelings" for J.R., and he knew from his therapy that he should not visit J.R.'s Facebook page.

42

Thus, at his evidentiary hearing, Myers admitted that he knew he should not be visiting J.R.'s Facebook page, but he did so anyway. The fact that Myers continued his behavior, which he knew was wrong, over a year after filing his application for medical license reinstatement strongly suggests that Myers' recognition of his wrongful conduct was inauthentic. Otherwise, Myers would have refrained from engaging in this conduct he believed was wrong, understanding that this conduct hurts himself and the medical profession.

As for Myers' argument that his interaction with the AA attendee establishes that he has recognized his wrongful conduct, for reasons just discussed, we find this argument problematic. We thus reject Myers' contention that his interaction with the AA attendee somehow showed that he now recognizes his past wrongful conduct.

Finally, we find the notes Myers apparently gave to his attorney, which Keenan ultimately received, support that he has not recognized his wrongful conduct or the effect that wrongful conduct had on the medical profession. Although the ALJ and Board did not rely on Myers' notes, this court's standard of review requires us to consider the agency's decision in light of the record as a whole. See K.S.A. 77-621(d). Once again, in these notes, which Myers wrote the same month he applied for his medical license reinstatement, Myers complained that "[t]he price [he] paid and continue[d] to pay [was] way too high!"

Simply put, if Myers utterly understood the extent of his wrongdoing, he would not complain about his discipline. Instead, he would recognize that his KHAA violations justified his discipline. Given the preceding, substantial evidence supported the Board's finding that Myers had not established recognition of his wrongdoing by clear and convincing evidence.

43

*Myers' rehabilitation efforts*

Before the ALJ, Myers primarily relied on Keenan's testimony about his progress in therapy as evidence that he engaged in sufficient rehabilitation efforts. The ALJ, however, rejected Myers' argument because she discredited Keenan's testimony about Myers' progress in therapy. In his petition for review, Myers asserted that the ALJ could not find that he had not established sufficient rehabilitation efforts by clear and convincing evidence just because she discredited Keenan's testimony. But the Board disagreed, adding that Keenan's testimony lacked credibility because she did not believe Myers needed another multidisciplinary psychiatric evaluation contrary to the PRC's recommendation. The Board then found that Myers' arguments concerning his rehabilitation also ignored that the June 2013 consent order required him to comply with this PRC recommendation. The Board concluded that had Myers "made advancements under [Keenan's] care, . . . then a follow up evaluation [was] a method to assess both the nature and extent of [his] advancement."

On appeal, Myers contends that the PRC never recommended that he complete another multidisciplinary psychiatric evaluation. Thus, Myers argues that the Board erred by finding there was a PRC recommendation to complete another multidisciplinary psychiatric evaluation. And he contends that the Board further erred by finding that this nonexistent recommendation was a requirement under his June 2013 consent order. Myers also continues to argue that Keenan's testimony about his improvements in therapy, in and of itself, established his successful rehabilitation efforts.

Nevertheless, to begin with, Myers' contention that the PRC never recommended that he complete another multidisciplinary psychiatric evaluation is meritless. In the PRC's letter to the Board, the PRC evaluators recommended the following: "At such a time that Dr. Myers appears ready to engage openly in an intensive treatment process for professionals, the team would be open to evaluating him for appropriateness of re-

44

initiating treatment at PRC or at another appropriate facility." At Myers' evidentiary hearing, one PRC evaluator—clinical psychologist Dr. Betsy Williams—confirmed that this recommendation meant that Myers should return for another evaluation once he was mentally ready to openly address his problems.

Next, Myers' argument that the Board wrongly found that the June 2013 consent order required him to complete another multidisciplinary psychiatric evaluation has some merit. When explaining why it found Myers' rehabilitation efforts insufficient, the Board wrongly referred to the PRC's recommendation for a supplemental multidisciplinary psychiatric evaluation as a requirement under his June 2013 consent order. Because a supplemental multidisciplinary psychiatric evaluation was not a requirement under his June 2013 consent order, the Board erred in making this finding.

Yet, we note that Myers stopped participating in MAP monitoring in June 2013 in violation of his April 2011 consent order. Accordingly, even if Myers did not violate a consent order requirement that he complete another multidisciplinary psychiatric evaluation, he did violate a consent order requirement that he participate in MAP monitoring through July 2015. So any error stemming from the Board's mistaken finding that Myers had not complied with his PRC recommendation to complete another multidisciplinary psychiatric evaluation as required under his June 2013 consent order is harmless. See K.S.A. 77-621(e).

As for Keenan's testimony, as discussed, substantial evidence supported the Board's credibility determination against Keenan because it is undisputed that Keenan's opinions differed from other medical professionals regarding Myers' need for another multidisciplinary psychiatric evaluation. As a result, Myers cannot successfully challenge the Board's rehabilitation efforts finding by relying solely on Keenan's discredited testimony.

In summary, despite Myers' arguments to the contrary, it is undisputed that Myers did not comply with recommendations and requirements designed to address his professionalism and boundary problems. Myers' failure to comply with these recommendations and requirements undermined his evidence supporting his sufficient rehabilitative efforts. Thus, substantial evidence supported the Board's finding that Myers failed to establish sufficient rehabilitation efforts by clear and convincing evidence.

*Myers' original wrongful conduct*

Before the ALJ, Myers argued that "[t]he instances of bad decisions and actions, which span several years and which, if considered individually do not amount to a serious violation of the healing arts act." Myers also made several arguments about why the conduct the Board disciplined him for was not actually conduct violative of the KHAA. Based on the preceding arguments, Myers asserted that his original wrongful conduct should not bar reinstatement of his medical license. But the ALJ rejected this assertion because the record established that Myers had committed numerous serious violations of the KHAA.

Myers petitioned the Board to review the ALJ's finding, making the same arguments regarding the seriousness of his original wrongful conduct. In affirming the ALJ, the Board addressed Myers' argument that his original wrongful conduct was not so significant "because there [was] no one single source or specific original misconduct." The Board rejected this argument because "it minimize[d] the nature and extent of his violations" under the KHAA. The Board further found that Myers' "long-standing pattern of inappropriate behavior and conduct, combined with his disregard of professional recommendations for remediation, [was] as significant, if not more serious, than a single event of misconduct."

On appeal, Myers continues to make the same arguments that he made before the ALJ and the Board. He does not deny making bad decisions in the past. Still, he describes his original wrongful conduct as "instances of bad decisions and actions" that "do not amount to a serious (or any) violation of the healing arts act." He also continues to contest the seriousness of his original wrongful conduct by challenging whether he actually violated the KHAA. Specifically, he argues that when the Board weighed this factor against him, it failed to recognize the following:  (1) that stalking was not grounds for discipline under the KHAA; (2) that his relationship with L.T. was not grounds for discipline under the KHAA; (3) that refilling P.S.'s prescription for weight loss medication was not grounds for discipline under the KHAA; (4) that J.R. was an aggressor in their relationship; (5) that the presiding officer who vacated the emergency order suspending his medical license described his violations as "technical violations"; and (6) that there was nothing inappropriate about conducting breast and pelvic examinations on two of his coworkers because this occurred in the 1990s.

To review, Myers' struggles go back to 2006, when he was originally referred to MAP for physically grabbing a nurse to get her attention, for yelling at a nurse, and for returning a dirty diaper to the nurses' station. Myers' stalking troubles began in September 2009 after J.R. ended their relationship. Perhaps most significantly, Myers continued to stalk J.R. even when his stalking had adversely affected his life, resulting in two misdemeanor stalking citations, losing his job at ACH twice, and losing his ability to practice medicine twice—first when he voluntarily changed his medical license to inactive status in April 2010, and second when the Board revoked his medical license in June 2013. The last known incident of Myers physically stalking J.R. occurred five months after his medical license revocation in November 2013.

When the Board revoked Myers' medical license, it did so for multiple reasons. Again, the Board found that Myers' stalking constituted a willful and repeated violation of the KHAA contrary to K.S.A. 65-2836(f). It found that Myers violated his consent

order by not always using Board-approved female chaperones when treating female patients and by not regularly attending therapy; it then found that those violations contravened K.S.A. 65-2836(k). It found that Myers exploited his doctor-patient relationship with L.T. to have a sexual relationship with L.T. contrary to K.S.A. 65-2836(b) and K.S.A. 65-2837(b)(16). Also, it pointed to Myers' decision to refill P.S.'s weight loss prescription as evidence of his wrongdoing under the KHAA.

Myers' contention that the Board should have recognized that he did not technically violate the KHAA by stalking J.R., having a sexual relationship with L.T., and refilling P.S.'s prescription is troubling. Myers' April 2011 consent order required Myers to comply with all court orders. Yet, it is undisputed that Myers continued to break the law by stalking J.R. even when J.R. had a protection from stalking order against him. And Myers' argument that he did not technically violate the KHAA by stalking J.R., having a sexual relationship with L.T., and refilling P.S.'s prescription ignores that when he signed the June 2013 consent order, he agreed that sufficient evidence established his KHAA violations and "waive[d] his right to dispute or otherwise contest" that he had violated the KHAA.

Moreover, Myers' contention that the Board did not adequately consider J.R.'s role as the aggressor in their relationship is the epitome of victim-blaming. In his brief, Myers contends that Westgate testified about J.R.'s aggressive behavior. If Westgate testified to this, it is seemingly missing in the record on appeal. The most significant evidence concerning J.R.'s alleged aggressive behavior comes from Myers' evidentiary hearing. At that hearing, Myers' friend Newsome described J.R. as the aggressor in Myers and J.R.'s relationship. Myers now relies on this evidence to support his argument that the Board overemphasized the seriousness of his original misconduct.

Not only does Myers' reliance on J.R.'s alleged aggressive behavior reflect poorly on Myers' previous assertion that he has recognized his past wrongful conduct, it does not

support his current argument that the Board overemphasized the seriousness of his original misconduct. Simply put, even if J.R. engaged in aggressive behavior, this fact would not nullify his decision to stalk. No behavior excuses breaking the law and stalking somebody.

Myers' remaining arguments involve his compliance with his April 2011 consent order and MAP monitoring contract requirement to have Board-approved female chaperones with him whenever he treated female patients. Myers points to the March 2013 order vacating the emergency suspension of his medical license as evidence that his violations were not too serious. He notes in that order, the presiding officer vacated the emergency suspension because he had committed only technical violations of his April 2011 consent order. Also, he asserts that he never violated the female chaperone requirement by giving breast and pelvic exams to his coworkers because he conducted those exams in the 1990s, before he had a female chaperone requirement.

Yet, Myers' arguments are disingenuous. Myers' April 2011 consent order and MAP monitoring contract required him to have "Board approved" female chaperones. At the hearing on the March 2013 emergency order suspending Myers' medical license, Myers told the presiding officer that he had always had female chaperones present when he treated female patients, but the female chaperones were not necessarily "Board approved" female chaperones. Based on this information, the presiding officer vacated the emergency suspension of Myers' medical license because it found that Myers' failure to use *Board-approved* female chaperones was only a technical violation of his April 2011 consent order and MAP monitoring contract.

But when Myers received intensive therapy at the PRC, he revealed that he had conducted breast and pelvic examinations on two coworkers without *any* female chaperone present. Also, shortly after he left the PRC, he notified the Board that he had treated about four or five women in their homes with only their male spouses present. In

its final order, the Board cited Myers' dishonest statements to the presiding officer about always having female chaperones present as evidence of his wrongdoing in violation of the KHAA.

Myers' assertion that he gave the breast and pelvic exams to his coworkers in the 1990s is dubious. The requirement that a female chaperone accompany Myers when treating female patients did not exist until Myers signed his MAP monitoring contract in July 2010. Myers disclosed giving breast and pelvic exams to two coworkers when he was receiving intensive therapy at the PRC in June 2013. In the PRC's discharge summary, the PRC evaluators reported that Myers had "disclosed that he conducted breast and pelvic examinations on two of his former nurses *without a chaperone present*." (Emphasis added.) The PRC evaluators also reported that Myers disclosed that he had not performed more than a handful of breast and pelvic examinations during the last 12 years. The PRC evaluators' notes made no reference to the exams occurring in the 1990s. Also, Myers never alleged that this incident occurred in the 1990s until after applying for reinstatement of his medical license.

Notwithstanding this dubious contention, Myers' argument contesting when those exams occurred is irrelevant because in the June 2013 consent order, he agreed that he had examined four or five female patients in their homes without a female chaperone present. As a result, regardless of when he performed the breast and pelvic examinations on his coworker, it is undisputed that Myers' original misconduct included violating his April 2011 consent order and MAP monitoring contract by examining female patients without having a female chaperone present.

In summary, Myers' contention that his original wrongful conduct was not too serious and, therefore, should not weigh against his medical license reinstatement is entirely meritless. As a result, substantial evidence supported the Board's finding that he had not provided clear and convincing evidence that his original misconduct was

50

insignificant. For this reason, the Board acted reasonably when weighing this *Vakas* factor against him for purposes of his medical license reinstatement.

*The conduct Myers engaged in after discipline*

Before the ALJ, Myers argued that he engaged in good conduct following his discipline by pointing to his efforts to improve his relationships with others. Myers also pointed to his volunteer work at Mercy. The ALJ rejected Myers' argument that he had engaged in good conduct since being disciplined, in part, because he never completed another multidisciplinary psychiatric evaluation and never took a CME course on professional boundaries.

Myers petitioned the Board to review the ALJ's finding regarding his conduct following discipline. He argued that insufficient evidence supported the ALJ's finding given his efforts to improve his relationships with others and his volunteer work at Mercy. But the Board also rejected Myers' argument. In doing so, it first commended Myers for his therapy progress and volunteer work at Mercy. Yet, it then found that to establish his good conduct by clear and convincing evidence, Myers should have done more. Specifically, the Board found that Myers should have completed another multidisciplinary psychiatric evaluation as recommended by the PRC, and he should have complied with his MAP monitoring contract.

As he did below, Myers argues that he engaged in good conduct since his license revocation by pointing to his efforts with Keenan in therapy to improve his relationships with others as well as his volunteer work at Mercy. He argues that the preceding evidence established by clear and convincing evidence that he engaged in good conduct since his medical license revocation. Also, he contends that the Board should not have relied on the "things that [he] ha[d] not done" since being disciplined when weighing this *Vakas* factor against him.

Myers' current argument is similar to some of his previous arguments. Myers' therapy progress with Keenan and volunteer work at Mercy are positive steps. Nevertheless, it is undisputed that Myers failed to follow the recommendations of many professionals over the years, including PEP's recommendations to attend a group like Sex Addicts Anonymous, PEP's recommendation to complete a CME course on leadership, and the PRC's recommendation to return for another multidisciplinary psychiatric evaluation. As we noted earlier while addressing Myers' previous arguments, even if the preceding recommendations were not requirements, Myers' completion of the recommendations would have supported Myers' testimony that he was rehabilitated and currently engaging in good conduct. Likewise, Myers' compliance with his MAP monitoring contract as required by his April 2011 consent order would have supported Myers' testimony that he was rehabilitated and currently engaging in good conduct.

Not to mention, Myers' argument ignores the other questionable conduct he has engaged in since the Board revoked his medical license in June 2013. This includes his continued stalking and monitoring of J.R., failure to timely complete paperwork related to closing his solo practice, and dishonest deposition testimony.

Although the Board did not cite the preceding evidence when making its findings on the quality of Myers' conduct since his medical license revocation, this court's standard of review requires us to consider the Board's findings in light of the record as a whole. See K.S.A. 77-621(c)(7), (d). Under that standard of review, the record supports that Myers has taken some positive steps since his medical license revocation. On the whole, however, the record establishes that Myers has not complied with professional recommendations, has violated his April 2011 consent order, and continues to engage in questionable conduct. As a result, substantial evidence supports the Board's finding that Myers did not present clear and convincing evidence that his conduct following his medical license revocation supported reinstatement of his medical license.

*The time which has elapsed since Myers' discipline*

Before the ALJ, Myers argued that the time that had elapsed since the Board revoked his medical license was irrelevant in determining whether to reinstate his medical license. In the initial order, however, the ALJ found that the time that had elapsed since the Board revoked Myers' medical license weighed against Myers' medical license reinstatement because Myers engaged in misconduct for several years. When Myers petitioned the Board to review the ALJ's finding, he again asserted that the time that had elapsed since his original discipline was irrelevant in determining whether to reinstate his medical license. But the Board found that Myers "could have used the time" since his medical license revocation to complete another multidisciplinary psychiatric evaluation as recommended by the PRC and participate in MAP monitoring. So the Board weighed this factor against Myers for the same reasons it weighed the factor concerning Myers' conduct since discipline proceedings began against him.

On appeal, Myers continues to argue that the time that has elapsed since his discipline is an immaterial factor for purposes of determining whether to reinstate his medical license. He further argues that the Board conflated this factor—the time that has elapsed since his discipline—with the previous factor—his conduct since discipline. Based on this conflation, Myers contends that substantial evidence does not support the Board's weighing of the time-elapsed factor against him.

When our Supreme Court created the *Vakas* factors, it adopted the factors it had already established for determining whether to reinstate a law license as stated in *Russo*. 248 Kan. at 600. Although the *Russo* court did not explain the application of each factor, it did approve of a case that balanced a licensee's progress against "'the length of time which has elapsed since disbarment.' [Citation omitted.]" 230 Kan. at 11. The *Vakas* factor about "conduct subsequent to discipline" involves a licensee's behavior since being

53

disciplined while the *Vakas* factor about "the time which has elapsed since the original discipline" involves whether the licensee has been disciplined long enough. Based on the preceding, the Board clearly conflated the *Vakas* factor about a licensee's conduct since discipline with the *Vakas* factor about the time that has elapsed since the licensee's discipline.

Even so, it does not seem that the ALJ conflated this *Vakas* factor. When addressing the time that had passed since his original discipline, the ALJ noted: "While Dr. Myers entered into the Consent Order for Surrender in 2013, his pattern of unprofessional conduct dates back to at least 2006."

Myers has not addressed the ALJ's fact-finding on appeal. Thus, Myers has waived his ability to challenge that fact-finding on appeal. See *In re Marriage of Williams*, 307 Kan. at 977 (holding that an issue not briefed by an appellant is deemed waived and abandoned). Furthermore, it is undisputed that Myers' pattern of professional misconduct dates back to at least 2006 when he was first referred to MAP services based on his negative encounters with nursing staff. It is also undisputed that Myers applied for reinstatement of his medical license in June 2015, just two years after the Board revoked his medical license. Although the Board stayed Myers' application proceedings until three years had passed since his medical license revocation as required under K.S.A. 65-2844, it was reasonable for the ALJ to have concerns about whether Myers' misconduct warranted a longer term of discipline given Myers engaged in misconduct over a span of several years.

Thus, Myers correctly argues that in weighing the time-elapsed factor against him, the Board wrongly conflated the *Vakas* factor on the "conduct subsequent to discipline" with the *Vakas* factor on "the time which has elapsed since the original discipline." Nevertheless, the Board adopted the ALJ's fact-findings. So the Board's conflation does not undermine the ALJ's finding that the duration of Myers' punishment was not long

when compared to the duration of his misconduct. In turn, substantial evidence supports the finding that Myers failed to present by clear and convincing evidence that the time that had elapsed since his original discipline supported reinstatement of his medical license.

*Myers' character, maturity, and experience when disciplined*

Before the ALJ, Myers argued that he did not "blame youthfulness or inexperience for his missteps." He also added that his previous misconduct stemmed from "traits that became engrained over time and that required hard work for him to manage." In other words, before the ALJ, Myers admitted that the "character, maturity, and experience" when disciplined factor did not weigh in favor of his medical license reinstatement because his prior bad conduct resulted from "traits that became engrained over time." As a result, in the initial order, the ALJ found that Myers had not established by clear and convincing evidence that this factor weighed in favor of his medical license reinstatement. In doing so, the ALJ noted that Myers was 57 years old when the Board revoked his medical license. The ALJ also stressed that Myers had been practicing medicine for nearly 25 years, which meant he was well versed in the KHAA's requirements when he was disciplined.

When Myers petitioned the Board's review of this finding, however, Myers merely alleged that his character, maturity, and experience when disciplined was "not a material factor." The Board rejected this contention by pointing to his age and experience in medicine when disciplined. The Board also pointed to the fact that Myers struggled before his license revocation even when organizations like Rush, PEP, and MAP tried to help him address his problematic professionalism and boundary behaviors.

Now, on appeal, Myers contends that the Board erred by weighing this factor against reinstatement of his medical license. Myers seemingly contends that by asserting

55

before the ALJ that his problems were not the result of youth or inexperience, he had argued that this factor neither weighed in favor nor against his medical license reinstatement. He further contends that the Board's reliance on his persistent problematic professionalism and boundary behaviors was unreasonable because it shows the Board's "continued wallowing in the past without considering rehabilitation from that past."

Nevertheless, Myers' current argument ignores that when he was before the ALJ, he admitted that he understood that his character, maturity, and experience when disciplined did not mitigate the nature of his misconduct. He admitted that his previous misconduct stemmed from "traits that became engrained over time and that required hard work for him to manage." It is a well-known rule that parties who invite error cannot complain about that error on appeal. *In re Tax Appeal of Professional Engineering Consultants*, 281 Kan. 633, 639, 134 P.3d 661 (2006). Here, by admitting to the ALJ that this factor weighed against his reinstatement, he cannot now complain that the ALJ weighed this factor against his reinstatement on appeal.

We further note that the facts about Myers' character, maturity, and experience when he was disciplined are not disputed. As addressed by both the ALJ and the Board, Myers was an experienced doctor when the Board revoked his medical license in June 2013. This fact clearly weighs against the reinstatement of Myers' medical license. We thus hold that even if Myers had not invited the error he complains about, substantial evidence supported the Board's finding regarding Myers' character, maturity, and experience.

*Myers' present competence to practice medicine*

Before the ALJ, Myers included only the following argument concerning his present competence to practice medicine:  "Dr. Myers has worked to maintain medical knowledge through appropriate continuing education. This includes hands-on courses in

56

addition to lectures." The ALJ rejected Myers' contention that his completion of CME courses established his present competence to practice medicine by clear and convincing evidence for the following reasons:  (1) because he never completed a skills assessment to determine if his current medical skills were adequate; (2) because completion of CME courses did not establish he was fit to "operate on a real person"; (3) because he never completed any CME course involving professionalism; (4) because he never completed any CME course involving clinical interactions with a live patient; and (5) because his evidentiary hearing testimony about maintaining his surgical skills by weeding a garden "call[ed] into question his judgment as such belief [was] absurd."

When Myers challenged the ALJ's finding that he had not established his present competence to practice medicine by clear and convincing evidence, he still pointed to his completion of CME courses. At arguments before the Board, Myers sought to admit into evidence documentation showing that he had completed more CME courses since the evidentiary hearing before the ALJ. But the Board's litigation attorney objected to the admission of this new evidence, and the Board sustained the litigation attorney's objection. Also, the Board affirmed the ALJ's finding that Myers had not established his present competence to practice medicine. In doing so, the Board noted that it regularly requires a professional skills assessment for doctors who have not practiced medicine for more than two years. The Board also used its own medical knowledge to refute Myers' assertion that he could maintain his surgical skills by weeding a garden.

On appeal, Myers makes three arguments. First, he asserts that the Board could not find his present medical skills lacking because he had not completed a skills assessment. Myers notes that completion of a skills assessment is not a requirement for reinstatement of a medical license. Second, he asserts that the Board's denial of his request to admit evidence of his additional CME course completion was arbitrary. Third, he asserts that his CME course completion constitutes clear and convincing evidence of his present competency to practice medicine.

57

Myers correctly argues that no statute, order, or contract required him to complete a medical skills assessment before applying for reinstatement. See K.S.A. 65-2809(e) (stating that the Board may require a person who has not actively practiced medicine for two or more years to complete a medical skills assessment). Even so, as with his arguments regarding the Rush, PEP, and PRC recommendations he never completed, Myers' argument ignores that completion of a medical skills assessment would have provided the Board with strong evidence concerning his current competency.

Next, regardless of whether the Board acted arbitrarily when it denied his request to admit evidence of additional CME course completion, Myers' argument that his CME course completion establishes his current competency in medical skills is unpersuasive. To review, the record indicates that Myers' CME course attendance was as follows: (1) after he surrendered his license in 2013, Myers completed 51 hours of CME courses; (2) in 2014, Myers completed 73.5 hours of CME courses; (3) in 2015, Myers completed 24.75 hours of CME courses; and (4) in 2016, Myers completed 36.75 hours of CME courses. At the evidentiary hearing, Myers testified that he completed a total of 49.5 hours of CME courses in 2016, but he provided no documentation to show that he had completed those hours. The evidence Myers sought to admit at oral arguments before the Board indicated that he had completed 50.25 hours of CME courses in 2017.

Nevertheless, Myers testified that doctors must complete 100 hours of CME courses every two years to maintain their medical license. Here, even if we consider all the CME coursework evidence Myers wanted the Board to consider, Myers did not complete a total of 100 hours of CME courses in 2015 and 2016. Simply put, if Myers wanted to establish his current medical skills competency by pointing to his prior CME course completion, he should have at the very least completed the minimum CME coursework requirement for persons actively practicing medicine each year since his

58

medical license revocation. Myers' failure to do this in 2015 and 2016 raises serious doubts about his current medical skills competency.

Myers' argument also ignores that the ALJ correctly found that he has never completed a CME course involving professionalism or interactions with live patients. Once again, the PEP evaluators recommended that Myers complete a CME course on leadership. Because the PEP evaluators recommended that Myers complete a CME course on leadership, Myers' failure to complete any CME course involving his social skills as a doctor since his medical license revocation is troubling.

Simply put, Myers' CME coursework does little to establish his current medical skills competency either as a surgeon or as a doctor who can professionally interact with patients and staff. Indeed, the CME coursework Myers has not completed raises serious questions about his present competency. For these reasons, we hold that substantial evidence supported the Board's finding that Myers had not established his present competence in medical skills by clear and convincing evidence.

Vakas *factors summary*

To summarize, some of Myers' arguments may have merit. For instance, the Board wrongly described PRC's recommendation to complete another multidisciplinary psychiatric evaluation as a requirement. Also, the Board wrongly conflated the *Vakas* factor regarding a licensee's conduct since discipline with the *Vakas* factor regarding the time that had elapsed since the licensee's original discipline. Nevertheless, the vast majority of Myers' arguments about the Board wrongly weighing the *Vakas* factors against him fall short of the mark. When considering Myers' arguments in light of the record as a whole, it is readily apparent that substantial evidence supported the Board's finding that Myers failed to establish sufficient rehabilitation efforts by clear and

convincing evidence under the *Vakas* factors. And for this reason, the Board's denial of Myers' application for reinstatement of his medical license was reasonable. So we affirm.

Affirmed.

* * *

ATCHESON, J., concurring: I concur in the results the majority reaches on both the gatekeeper jurisdictional issue governing the timeliness of Daniel L. Myers' appeal to this court and the substantive issue entailing Myers' application for reinstatement of his license to practice medicine. So we have jurisdiction, and I see no basis for reversing the denial of the application.

As to our jurisdiction, I agree Myers timely submitted an electronic notice of appeal to the Clerk of the Shawnee County District Court that satisfied the requirements of Kansas Supreme Court Rule 2.02 (2020 Kan. S. Ct. R. 14), although the document lacked page numbers. Rule 2.02 requires a notice of appeal to this court to "be in substantial compliance" with the Kansas Judicial Council's prescribed form. The form is a single-page document to be accompanied by a certificate of service, presumably constituting a second page. It is unclear whether the form is intended to have page numbers, given its brevity. Even assuming Myers' notice of appeal was supposed to have page numbers (an assumption I tend to doubt), the notice was substantially compliant within the meaning of Rule 2.02 without them. The notice contained all of the substantive information required under K.S.A. 60-2103(b) governing civil appeals and delineated in the Judicial Council form. See K.S.A. 77-623 (judicial appeals of agency actions under Kansas Judicial Review Act procedurally handled "as in other civil cases").

The district court clerk refused to file Myers' notice based on a local rule requiring all submissions to have page numbers. As applied here, the general local rule conflicts

60

with the substantial compliance provision of Rule 2.02 specifically covering notices of appeal. The local rule must yield. See Kansas Supreme Court Rule 105(a)(4) (2020 Kan. S. Ct. R. 164) (local rules must be consistent with Supreme Court Rules). In turn, the clerk's rejection of the tendered notice was an ultra vires act and should not be accorded any substantive legal effect. Under the circumstances, the undisputed tender of a timely notice of appeal that conformed to the applicable statutes and Rule 2.02 must be treated as sufficient to preserve the appeal. I, therefore, agree that we have jurisdiction to consider Myers' appeal.[1]

[1]This case does not require us to consider the application of the Shawnee County local rule on page numbering apart from notices of appeal. A requirement for page numbers advances a beneficial purpose by facilitating convenient cross-referencing to specific parts of multipage motions or lengthy supporting memorandums. But there is no comparable need or benefit with a notice of appeal.

Turning to the merits of Myers' appeal, I concur in the result and, therefore, agree we must affirm the Board's decision denying the reinstatement application. I do so principally based on the narrow standard of review we apply and the heavy burden on Myers in the administrative proceedings to prove his case for reinstatement. Before the administrative law judge and the Board of Healing Arts, Myers had to prove by "clear and convincing evidence . . . sufficient rehabilitation to justify reinstatement." K.S.A. 65-2844. In other words, Myers had to demonstrate he was no longer unfit. That's akin to proving a negative, and that can be a difficult task. In addition, the burden of persuasion on Myers is a formidable one. A material factual proposition must be established as "highly probable" to satisfy the clear and convincing standard. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008). The burden is considerably higher than the "more probable than not" standard typical in civil proceedings, which theoretically requires something like a scintilla more evidence than equipoise to prevail.

On appeal, we do not directly apply a clear and convincing standard to the evidence, since that would entail an impermissible appellate reweighing of the evidence.

But that standard necessarily shapes our review. The administrative law judge heard the witnesses testify and reviewed the other evidence in the first instance. Upon Myers' request, the Board reviewed the ALJ's decision under the Kansas Administrative Review Act, K.S.A. 77-501 et seq., and was obligated to defer to the hearing officer's reasonable resolutions of conflicts in the evidence resting on credibility determinations. See K.S.A. 77-527(d) (on review of initial order, reviewing administrative authority "shall give due regard" to hearing officer's "opportunity . . . to determine the credibility of witnesses").

When Myers appealed the Board's decision to the district court, the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governed there and on further review here. Under the KJRA, we consider this appeal from the district court as if Myers' petition for review of the Board's decision had been originally filed with us. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); *Yeasin v. University of Kansas*, 51 Kan. App. 2d 939, 947, 360 P.3d 423 (2015). We effectively disregard the district court's decision-making and give no deference to it. Myers has to show the Board erred. See K.S.A. 77-621(a)(1); *Powell*, 290 Kan. at 567. In reviewing factual findings for error under K.S.A. 77-621(c)(7), we look at the record as a whole for substantial evidence supporting the agency determination given "the appropriate standard of proof." We are not to reweigh evidence generally or make new "veracity" determinations specifically. K.S.A. 77-621(d). Boiling down those layers of review, we must accept the agency's ultimate factual findings that Myers failed to marshal evidence clearly and convincingly showing he was no longer unfit to practice medicine if they have substantial support in the record. In doing so, we cannot make independent credibility determinations.

The record presents substantial evidence that for years Myers displayed a constellation of behaviors that were unprofessional and indicative of deleterious psychological traits or conditions. Those problems have been catalogued in detail in the majority opinion. They did not appear to have directly impaired Myers' skills as a

62

surgeon or general clinician. But Myers did exercise what the Board found to be lax or poor judgment from time to time in who to treat and where to provide treatment. In addition, Myers had intimate personal relationships with several women employed at the hospitals where he practiced. Although Myers did not supervise the women in the sense of making decisions about their terms of employment, such as compensation or promotions (at least as I understand the record), they would have been considered subordinates of his in the hospital hierarchy. Those relationships did not end well.

Particularly troubling has been Myers' obsessive stalking behavior directed at J.R., a nurse who worked at the same hospital. I use the term "obsessive" in a lay sense, but Myers has been professionally diagnosed with obsessive tendencies, as well. The two had a relatively short intimate personal relationship that J.R. called off. Myers, however, persistently contacted J.R. outside the workplace. J.R. eventually sought and obtained a court order to keep Myers away. He violated the order and was criminally charged. Myers apparently received diversion on the misdemeanor charges. But he continued to watch J.R. both directly and through social media in violation of restrictions on him. In a deposition taken in these proceedings, Myers lied about his conduct—denying any contact with J.R. even though he had visited a page she maintained on a social media platform a day earlier. Although Myers later admitted the false testimony, that was deep into this process and well after he filed for reinstatement of his medical license. Myers' untoward conduct directed at J.R. appears to be the most extended and quite arguably the most disturbing episode in the record. But it is just one of many circumstances reflecting bad judgment and questionable behavior on Myers' part.

Myers, of course, surrendered his medical license in 2013 as part of a consent order with the Board. He agreed to specific findings in that order and acknowledged that giving up his license in light of those findings would be treated as a revocation. Myers' application for reinstatement must be measured against that backdrop, and his evidence had to clearly and convincingly establish in the agency proceeding that he was no longer

63

unfit. The administrative law judge and the Board found he failed to satisfy that demanding standard. Our review is a circumscribed one, limited to assessing whether the denial finds evidentiary support in the record. And despite Myers' veiled invitation that we reweigh the evidence to reverse the Board, we cannot do so.

As a legal matter, the Board's decision to reinstate a person's medical license turns on a holistic assessment of the particular circumstances, channeled through a set of factors the Kansas Supreme Court originally identified for lawyer disciplinary proceedings. See *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 600, 808 P.2d 1355 (1991) (adopting eight factors from *State v. Russo*, 230 Kan. 5, 9, 630 P.2d 711 [1981], and noting reinstatement "'must be made on a case by case basis depending upon the facts involved'") (quoting *Russo*, 230 Kan. at 12). I do not repeat the majority's lengthy discussion of those factors. I, too, have used them as a template.

Myers' problems contaminated significant aspects of his personal relationships, his professional contacts, and sometimes the intersection of the two—with unfortunate and disquieting results. Myers treated patients in inappropriate settings. He couldn't handle duties ancillary to direct patient care that were nonetheless necessary to practicing in a hospital environment. He disregarded usual and expected boundaries between workplace and private relationships. And to euphemistically summarize the evidence, he often coped poorly with rejection or criticism in either sphere. Those problems persisted for years, despite multiple interventions by colleagues and mental health professionals. There is substantial evidence in the record indicating that during the reinstatement process at least some of those problems remained unresolved.

When appellate courts review determinations that must be proved by clear and convincing evidence, they ask whether a rational fact-finder could have found those determinations "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. Here, the record as a whole contains evidence of substance

that would persuade a reasonable fact-finder that Myers failed to demonstrate to a high probability that he had overcome the manifestations of unfitness that caused him to surrender his medical license. Given that standard of review, I would affirm the Board's decision to deny Myers' application for reinstatement.

At the same time, however, I am troubled by some of the ways the administrative law judge, the Board, and the majority have analyzed the evidence. Most prominently, they have transformed into substantive proof of Myers' continuing psychological impairment what his lawyer has done to challenge ostensible gaps in the agency's evidence and to suggest particular witnesses might be mistaken. They make a similar finding based on what they view as the lawyer's legal argument incorrectly characterizing the burden of proof to favor Myers. In effect, they treat the lawyer's tactical approach to various aspects of the case as circumstantial evidence supporting the clinical diagnosis of Myers as unwilling to accept responsibility and to admit wrongdoing. In other words, they conclude Myers could not have been rehabilitated because his lawyer endeavored to establish potential evidentiary weaknesses bearing on the nature and degree of at least some of the (mis)conduct and argued for what they perceive to be an erroneous legal standard. This seems to be both wrong and deleterious to an adversarial adjudicatory process.

To be sure, clients are bound by the legal effects of their lawyers' tactical decisions and any formal factual admissions or stipulations they may make during the litigation process. But a lawyer's strategic approach in questioning a particular witness or even in crafting a theme for the case is not itself circumstantial evidence. And a fact-finder should not infer historical facts adverse to the lawyer's client from those tactics or strategies. District courts typically instruct jurors to that effect. See PIK Civ. 4th 102.02 ("You must consider and weigh only evidence which was admitted during the trial, including exhibits, admissions, stipulations, and witness testimony[.]"); PIK Civ. 4th 102.04 ("Statements and arguments of counsel are not evidence, but may help you

65

understand the evidence and apply the law."); PIK Crim. 4th 50.050 ("In your fact finding you should consider and weigh everything admitted into evidence. This includes testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits."); PIK Crim. 4th 50.070 ("Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence.").[2]

[2]Jurors, of course, are first and foremost human beings—and typically human beings without legal training. Conventional wisdom, therefore, suggests they may not always compartmentalize their visceral reactions to what happens in a courtroom, notwithstanding instructions from the court otherwise. So a lawyer may be well advised to avoid an obstreperous, belligerent, or demeaning cross-examination of an obviously sympathetic witness quite apparently trying to tell the truth as he or she understands it. A lawyer can (and probably should) politely and deftly pose questions showing the witness could be mistaken in his or her initial perceptions or later recollections of those perceptions. Taking account of the human foibles of jurors in shaping trial strategy is quite different from a reviewing court endorsing a particular trial strategy as a form of circumstantial evidence or an admission attributable to the client.

We presume nonjuror fact-finders—commonly district court judges and sometimes law-trained administrative agency designees—understand the division between a lawyer's litigation strategies and legal arguments, on the one hand, and evidence that may be considered for or against the lawyer's client, on the other hand. *United States v. Stinefast*, 724 F.3d 925, 931 (7th Cir. 2013) ("Judges often hear improper argument and other forms of inadmissible evidence that they are presumed to disregard when deciding matters of importance."); *State v. Jackson*, 248 S.W.3d 117, 125 (Mo. App. 2008) ("A judge is presumed to be able to disregard inappropriate or improper argument and proceed to a fair result."); *Redondo v. Gomez*, No. 109,642, 2014 WL 802268, at *2 (Kan. App. 2014) (unpublished opinion) ("Judges are not susceptible to the same sort of undue influence that sharp practices may induce in jurors."). Here, the distinction has been impermissibly blurred. The lawyer's manner of cross-examination and argument of legal points have become substantive evidence against the client. That's

off the mark. But the resulting error is harmless under the circumstances in light of the actual evidence and the actual burden of proof on Myers.

Although I do not join in all of the reasoning behind the majority's decision, I agree with the ultimate result and, therefore, concur in affirming the denial of Myers' application for reinstatement of his medical license.